518 So.2d 1285 (1987)
Dennie Pryse EWEN, III, Appellant,
v.
STATE of Florida, Appellee.
No. 87-0329.
District Court of Appeal of Florida, Fourth District.
June 10, 1987.
On Motion for Rehearing February 10, 1988.
Richard L. Jorandby, Public Defender, and Thomas F. Ball, III, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Jr., Atty. Gen., Tallahassee, and Carolyn V. McCann, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
AFFIRMED. See Berry v. State, 493 So.2d 1098 (Fla. 4th DCA 1986).
DOWNEY, GLICKSTEIN and WALDEN, JJ., concur.

ON MOTION FOR REHEARING
PER CURIAM.
Appellant, in his motion for rehearing, asserts that our affirmance of this case presents a conflict with Kearse v. State, 384 So.2d 272 (Fla. 4th DCA 1980). However, Kearse is distinguished from this case by the following factors. First, in Kearse, the incident took place in broad daylight, whereas in the instant case, it was late at night. Second, in Kearse, the leaning into the window took place at a gas station, whereas in this case, the leaning into the window occurred across the street from two known crack houses. Finally, in Kearse, the hypodermic syringe was observed as a result of a pat down search which was conducted after the illegal stop. In the instant case, by way of manifest difference, the single edge razor blade was observed in plain view after the stop. We find that the differences between this case and Kearse and the totality of the circumstances in the instant case do support the conclusion that the appellant was legally stopped. See also Murphy v. State, 512 So.2d 1006 (Fla. 4th DCA 1987) (where one *1286 of the facts recited was that a black male was "handing in the window" of appellant's car).
With regard to the racial insinuation contained in the dissent, we should keep in mind that the focal point in this case is whether there was a founded suspicion to detain appellant. As we all know, in order to justify the stop in this, or any other such case, only a founded suspicion in the mind of the detaining officer is required. State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978). A founded suspicion is a suspicion that has some factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge. Stevens, supra. Factors to be considered as reasonably suggesting the suspect's involvement in the possible commission of a crime are:
The time; the day of the week; the location; the physical appearance of the suspect; the behavior of the suspect; the appearance and manner of operation of any vehicle involved; anything incongruous or unusual in the situation as interpreted in the light of the officer's knowledge.
354 So.2d at 1247. Here, we have a white suspect in a predominantly black neighborhood, late at night, parked in his truck across the street from two known cocaine rock houses. A black male known to the police as a drug pusher is seen leaning into the cab of the truck on the driver's side thereof. In addition to those objective facts, the police know from their experience that the presence of a white person in this neighborhood at nighttime indicates a drug buy. In answer to the following question: "Is it incongruous to have someone, a white male, in that area in that specific location, at that time of night?", the arresting officer testified: "The only ones I have seen there are there to buy cocaine." We suggest this scenario and the experience of the officers involved is exactly what this court meant in Stevens when it listed one of the factors as "anything incongruous or unusual in the situation as interpreted in the light of the officers' knowledge." Nor is this scenario unusual in the jurisprudence of this state during the past decade with the particular reference to cases involving the illicit sale of drugs.
Accordingly, the petition for rehearing is DENIED.
DOWNEY and WALDEN, JJ., concur.
GLICKSTEIN, J., dissents with opinion.
GLICKSTEIN, Judge, dissenting.
I now feel that in agreeing with the original PCA I failed to heed my own words in Six Essential Ingredients of Extraordinary Judging and Lawyering: Craftsmanship, Industry, Sensitivity, Courage, Fun and Service, The Florida Bar Journal, (January, 1985):
Every case should appear to a judge as having an inner essence that can be perceived only if the judge's receptivity is sharply honed. While sensitive judges may differ in their value judgments, all share a responsibility to reach a level of concern that reveals the heart of the matter.
Id. at 52. Even when the defendant's motion for rehearing was filed, initially I did not dig deeply enough to take into consideration, in its historical perspective, the important constitutional issue that is involved here.
The writer could not foretell when he authored Kearse v. State, that it would be more important in 1988 as authority to hold onto the principles recited therein six years earlier. It was written at a time when most of us did not yet perceive a trend toward erosion of individual rights in keeping with a massive emotional swing to the right in this nation and state. In 1982, we Floridians adopted a constitutional amendment which, by tying Florida law to United States Supreme Court decisions, effectively *1287 gutted Section 12 of our State's Declaration of Rights. There truly must be a pendulum, as Arthur M. Schlesinger, Sr., observed, swings every so often from left and right.
Justice Douglas must have recognized this swing; and he kept his foot on the brake, all the way to the floor, when he perceived as sensitive a court as the Warren Court to be eroding individual rights. In his dissent in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) he raised a grave concern that for the first time the nation's highest court was permitting a warrantless seizure of an individual without the necessity of finding probable cause. His concurrence in United States v. Brignoni-Ponce, 422 U.S. 873, 889, 95 S.Ct. 2574, 2584, 45 L.Ed.2d 607, 621 (1975) echoed the same:
The fears I voiced in Terry about the weakening of the Fourth Amendment have regrettably been borne out by subsequent events. Hopes that the suspicion test might be employed only in the pursuit of violent crime  a limitation endorsed by some of its proponents  have now been dashed, as it has been applied in narcotics investigations, in apprehension of "illegal" aliens, and indeed has come to be viewed as a legal construct for the regulation of a general investigatory police power. The suspicion test has been warmly embraced by law enforcement forces and vigorously employed in the cause of crime detection. In criminal cases we see those for whom the initial intrusion led to the discovery of some wrongdoing. But the nature of the test permits the police to interfere as well with a multitude of law-abiding citizens, whose only transgression may be a nonconformist appearance or attitude. As one commentator has remarked:
"`Police power exercised without probable cause is arbitrary. To say that the police may accost citizens at their whim and may detain them upon reasonable suspicion is to say, in reality, that the police may both accost and detain citizens at their whim.'" Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 395 (1974).
Even the opinion for the court in Terry states that any reasoning that attempts to draw a complete dichotomy between "a `stop' and an `arrest', or `seizure', of a person, and between a `frisk' and a `search' ... seeks to isolate from constitutional scrutiny the initial stages of contact between the policeman and the citizen [and] ... obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation." Terry v. Ohio, 392 U.S. 1, 17, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 903 (1968) (footnote omitted).
Elsewhere, Terry says that "in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. at 1879-80, 20 L.Ed.2d at 906. The reasonableness of the officer's action is determined by balancing the need to search or seize (as the case may be) against the invasion which the action entails. Id. at 21, 392 S.Ct. at 1879, 20 L.Ed.2d at 906, citing Camara v. Municipal Court, 387 U.S. 523, 534-35, 536-37, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967).
Simple good faith of the officer is not enough. If subjective good faith alone were the test, the protections of the fourth amendment would entirely evaporate. 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. Ultimately the objective standard is whether the facts known to the officer at the moment of the search or seizure warrant a man of reasonable caution in the belief that the action taken was appropriate. Anything less would invite intrusion on the protections against unreasonable search and seizure based on "nothing more substantial than inarticulate hunches." Id.
After nine years of judging, I wish to be concerned not merely for the good of the majority but for the good of the whole. *1288 The affirmance here will probably sit well with the majority of our citizens. It is a "tough on crime" opinion that gives the law enforcement officer more power than this court has previously bestowed. I feel, however, that it is a further erosion of individual rights in response to the state's call for assistance in policing narcotics use and sale; and that it renders us an agent for the state.
Let us review the transcript. At the hearing on the motion to suppress the officer described what he had seen about 10:30 P.M. on a Monday, just a few months before the hearing:
Q. Can you tell the Court what observations  where you were and what observations you made.
A. I was travelling eastbound and observed Dennie Ewen parked southbound across the street from 606 or 604 North Fourteenth Street. These are two known cocaine rock houses, which even the landlords have asked us to keep clear of the drug pushers.
Q. Do you know that based on your participation over the last few years patrolling that area?
A. These two houses only came up in the last year.
Q. Was it based on your  on this year's observations?
A. Yes sir.
Q. And, what did you see occur, if anything?
A. I saw a black male that had been known to me to be a drug pusher in the area at the driver's side door of Mr. Ewen's pick-up truck. After I drove past 
Q. Before we get to that. Can you tell me what you observed this individual  could you explain more clearly where he was. You said the driver's side window, was he standing near it, on it, leaning in it or how? How would you describe it?
A. Right next to the truck. I did see hands go in through the window.
Q. And then what occurred?
A. Mr. Ewen travelled southbound on North 14th Street; I pulled him over at  just south of Avenue D on 14th Street.
Q. Can you tell us whether  what race the driver of the car was?
A. He was white.
Q. And the person who was standing outside the car, the person that you knew had a reputation as a drug dealer?
A. He was black.
Q. Okay. Could you tell us the racial makeup of that neighborhood?
A. Predominantly black.
Q. Is it unusual to see a white person in there at that time of day?

A. Yes sir, it is.

Q. Is that why you stopped Dennie Ewen?

A. That and him being in the area with a drug pusher leaning in the window.

Q. Okay. Okay. And when you pulled him over what did you do then?
A. I asked him for his driver's license.
Q. Okay. Did he give you the driver's license?
A. Yes, he did.
Q. While you were standing there did you observe anything in or on or outside the car?
A. Yes sir. From the driver's side door you could see on the hump of the vehicle a plastic cassette case and a single edged razor blade.
Q. Did you have to lean in to see that or could you see that from outside the car?
A. I could see it from outside the truck.
Q. The truck, excuse me. Was it in plain view?
A. Yes sir, it was.
Q. Okay. And what did you do at that time?
A. I asked Mr. Ewen if I could look at it.
Q. And what did he say?
A. He said yes.

*1289 Q. Did you in fact look at it?
A. Yes sir, I did.
Q. And when you looked at it what did you observe?
A. There were tiny amounts of a white powdery substance on the blade and on the cassette case.
Q. Did you ask him what the razor blade was for?
A. Yes sir, I did.
Q. Did he reply?
A. Yes sir. He told me it was used for cutting his cocaine.
Q. And what did you do at that point?
A. At that point I believe I read him his rights right then. (Emphasis added)
Later, on redirect examination,[1] the officer testified:
Q. Is it incongruous to have someone, a white male in that area in that specific location at that time of night?
A. The only ones I have seen there are there to buy cocaine.
Q. Thank you.
The defendant testified in his defense:
Q. Dennie, were you on 14th Street on July 7th at approximately ten o'clock?
A. Yes, I was.
Q. At night. Was there also an unidentified black male?
A. Yes ma'am.
Q. How did you get there?
A. I got there from U.S. 1. I picked this man up; he's a friend of mine; I have worked with him before. I picked him up on 25th and Avenue O.
Q. Okay.
A. I was on my way to a boy's house that had offered me a job on a boat.
Q. Okay.
A. Fishing. At Avenue O, which is the last stop light, I believe, on 25th Street, the boy approached my truck; he knew who I was and everything and asked me to give him a ride.
[PROSECUTOR]: Excuse me, Your Honor, was he sworn in?
[DEFENSE COUNSEL]: Yes, he was.
[PROSECUTOR]: Okay.
A. He asked me to give him a ride over to his brother's house.
Q. Okay.
A. I didn't 
Q. Where is his brother's house?
A. I didn't ask him at the time or anything. I went on past my friend's house where I was supposed to go to see about the job; he wasn't home. I went down U.S. 1, cut across over to 13th Street, down 13th to Avenue I; when I got to Avenue I, I took a left going south. I asked him where it was and he told me at the corner of Avenue E and 14th Street.
Q. And what happened when you got to that point?
A. As I was passing by Avenue F I saw a squad car to my right.
Q. Okay.  (inaudible)  What did you do with the boy? Did you stop there at Avenue E?
A. I stopped at Avenue E and let him out of the truck.
Q. Okay. Did you pull up to a stop sign on Avenue E?
A. Yes ma'am.
Q. And was your motor still running?
A. Yes.
Q. And did the boy get out of the truck?
A. Yes ma'am.
Q. And what did he do?
A. He walked around to my side of the truck and told me thanks for the ride, if I needed anything to give him a call some time.
Q. Did he reach in and shake your hand  (indiscernible)  the ride?

*1290 A. Yes, he did.
Q. Okay. Then what did you do?
A. Pulled across the street. I was heading home. I was going south.
Q. And when you got past Avenue D you were pulled over?
A. When I got passed Avenue D I was pulled over.
The trial court said at the hearing, following counsels' arguments:
THE COURT: The Court knows that there are locations in the Lincoln Park area where people, black and white, go for the sole purpose of buying cocaine.
[DEFENSE COUNSEL]: The only other point I would make, Your Honor, is the State Attorney has emphasized that there was an incongruity here and the incongruity was a white man in that neighborhood and I say that you can't allow searches and seizures to take place based on the fact that a white person goes into a substantially black neighborhood. We do not have segregated neighborhoods in this state or in this town 
THE COURT: The Court is well aware of that.
[DEFENSE COUNSEL]: We can't allow that to be a violation of the law.
THE COURT: The Court is well aware of that. The Court is also familiar that there are and there is testimony right here that this place that he stopped is a drug place where they sell drugs.
The Court is going to rule in the face of that  what was that case we were looking at?
 McClure vs. State, 358 So.2d 1187 [Fla.2d DCA 1978] [sic], that the Police Officer had a well founded suspicion and the proof of the pudding is they found the guy and he confessed to being a cocaine user. Okay?
Motion is denied.
In McClure, the appellate court reversed the trial court's denial of the defendant's motion to suppress. Prior to the present case, Murphy v. State, 512 So.2d 1006 (Fla. 4th DCA 1987), upon which the majority relies, was the closest this court had historically come in these drug cases to the line over which this court should not cross. In retrospect, that decision may have gone too far, for individual rights are shored up or eroded, case by case, and piece by piece. Reliance on Murphy in the present case tends to bolster this concern, as Murphy involved flight, in addition to the other circumstances.
The United States Supreme Court has summarized the law of investigatory stops in the following manner, in the case of United States v. Cortez, 449 U.S. 411, 417-419, 101 S.Ct. 690, 694-95, 66 L.Ed.2d 621, 628-629 (1981):
The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); United States v. Brignoni-Ponce, 422 U.S., supra, at 878, 95 S.Ct., at 2578; Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1, 16-19, 88 S.Ct. 1868, 1877-1879, 20 L.Ed.2d 889 (1968). An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.[2] Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); United States v. Brignoni-Ponce, supra, 422 U.S., at 884, 95 S.Ct., at 2581; Adams v. Williams, 407 U.S. 143, 146-149, 92 S.Ct. 1921, 1923-1924, 32 L.Ed.2d 612 (1972); Terry v. Ohio, supra, 392 U.S., at 16-19, 88 S.Ct., at 1877-1879.
Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But *1291 the essence of all that has been written is that the totality of the circumstances  the whole picture  must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. See e.g., Brown v. Texas, supra, 443 U.S., at 51, 99 S.Ct., at 2640; United States v. Brignoni-Ponce, supra, 422 U.S. at 884, 95 S.Ct., at 2581.
The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions  inferences and deductions that might well elude an untrained person.
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact finders are permitted to do the same  and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in Terry v. Ohio, supra, said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Id., 392 U.S., at 21, n. 18, 88 S.Ct., at 1880, n. 18 (emphasis added). See also, Brown v. Texas, supra, 443 U.S., at 51, 99 S.Ct., at 2640; Delaware v. Prouse, supra [440 U.S.], at 661-663, 99 S.Ct. at 1400-1401; United States v. Brignoni-Ponce, supra [422 U.S.], at 884, 95 S.Ct., at 2581.
[2] Of course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.
Although the following quotation from Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), bears specifically on an arrest rather than an investigatory stop, one wonders in light of it  given the fact that we are not to dichotomize entirely between one form of intrusion upon an individual's right to be free from unreasonable search and seizure, and another  whether merely seeing a white person in contact with a purported drug dealer who is black, albeit in the late evening in an area populated by black people and known to be used for the sale of drugs, objectively "yield[s] a particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing." Cortez, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629.
The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.
392 U.S. at 62, 88 S.Ct. at 1902, 20 L.Ed.2d at 934.
In Sibron, the officer observed the appellant over an eight hour period in the company of and in conversation with known narcotics addicts, but had no knowledge of the subject of their conversations, and saw nothing pass between Sibron and the addicts.
Finally, I think the panel's reliance here upon State v. Stevens to be inappropriate. There, the defendants were pulling away from the vicinity of an equipment yard at 11:00 P.M. on a rainy Sunday night with a truck so loaded down with stolen material as to resemble a boat cutting through the *1292 water, prow up. Coils of copper wire were seen in plain view on the truck.
Here, the officer's appraisal, as well as the trial court's, was heavily dependent upon race. Though recognizing a great gulf as to both facts and legal considerations, I am nonetheless put in mind of Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In Lawson a California statute requiring persons who loiter or wander on the streets to provide "credible and reliable" identification and to account for their presence when requested by a law officer was found to be unconstitutionally vague. Lurking beneath the surface, however, was the fact that Lawson was detained or arrested pursuant to that statute some fifteen times in less than two years, as well as that a factor in at least some of those detentions may have been the presence of Lawson, a black man, in white neighborhoods.
In the interest of accuracy I must add that the Lawson court did not address whether a Terry stop was justified in the circumstances of the case; it was taken as a given that the statute in question, even were it not unconstitutionally vague, could be applied only if there were grounds for a Terry stop.
I fear that by slight rewording each time they rehearse the Terry standard, our courts have gradually weakened the safeguards of the fourth amendment.
NOTES
[1] On cross examination, defense counsel brought out that the officer, at his deposition, two months earlier than the hearing and two months after the arrest, may have been a considerable distance from the two men when he saw them, and that he had stopped the defendant for a driver's license check.