531 So.2d 182 (1988)
STATE of Florida, Appellant,
v.
Adrian AVERY, Appellee.
No. 87-0270.
District Court of Appeal of Florida, Fourth District.
August 3, 1988.
Rehearing Denied October 12, 1988.
*183 Robert A. Butterworth, Atty. Gen., Tallahassee, and Amy L. Diem, Asst. Atty. Gen., West Palm Beach, for appellant.
Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Asst. Public Defender, West Palm Beach, for appellee.
EN BANC
Rehearing En Banc Denied October 12, 1988.
STONE, Judge.
This is an appeal from an order granting a motion to suppress. Avery, a bus passenger, consented to a search by the police of his luggage, which was found to contain cocaine. The trial court determined that the consent was coerced. Its order provided:
Officer Chris Fahey testified that he and Officer Turner, both of the West Palm Beach Police Department comprised a unit which checked the Trailways Bus Station looking for people who might be acting as couriers for drugs northbound. They along with a dog trained to sniff for drugs would visit the bus station on a random basis for the purpose of checking northbound buses.
On July 26, 1986 at approximately 8:10 p.m., they boarded a bus stopped in West Palm Beach bound for Dallas. They were not in uniform but their badges were prominently displayed and they wore windbreakers which designated the department.
They proceeded to the rear of the bus and began interviewing passengers in an effort to gain their consent to search their luggage.
Officer Turner's attention was drawn to Mr. AVERY because he appeared nervous and used his feet to push his tote bag under the seat. It is noted that Mr. AVERY is a large man. As a result of Mr. AVERY's actions, he was subjected to the officer's questioning.
Officer Turner testified that he obtained the oral consent of Mr. AVERY to look through his baggage that was underneath his seat. The officers were aware that their Department had a written consent to search form but that they didn't feel it was necessary to use such a *184 form because it would take too much time and they couldn't do it for all passengers on board or something to that effect. Further testimony indicated that a consent form might be executed once a search had been completed and the suspect under arrest.
The prospect of being a seated passenger on a commercial public transportation vehicle and seeing police officers come on board with their badges prominently displayed checking each passenger is an intimidating and coercive situation in and of itself.
I find that if consent was given in this case it was coerced by the situation I have just described. Furthermore, I find that the Defendant's actions did not give rise to a founded suspicion which would justify his detention, Ingram v. State, 364 So.2d 821 (Fla. 5th [4th] DCA 1978); Robinson v. State, 388 So.2d 286 (Fla. 1st DCA 1980); Horvitz v. State, 433 So.2d 545 (Fla. 4th DCA 1983); Gorney v. State, 409 So.2d 220 (Fla. 4th DCA 1982).
This opinion is entered en banc because we consider the issue to be of exceptional importance.[1] We conclude that the trial court erred in determining that the defendant's consent was coerced, and reverse.
Whether consent is voluntary is a question to be determined from the totality of the circumstances. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, reh'g denied, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980); Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Denehy v. State, 400 So.2d 1216 (Fla. 1980).
In determining whether evidence may be excluded because it was obtained in the course of a warrantless search and seizure, we are obligated to follow the opinions of the Supreme Court of the United States. Art. I, § 12, Fla. Const.
In Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983), the Supreme Court discussed the concept of an encounter between an officer and an individual:
[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See Dunaway v. New York, supra, 442 U.S., at 210, n. 12, 99 S.Ct., at 2255, n. 12; Terry v. Ohio, 392 U.S., at 31, 32-33, 88 S.Ct., at 1885-1886 (Harlan, J., concurring); id., at 34, 88 S.Ct., at 1886 (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. Terry v. Ohio, 392 U.S. at 32-33, 88 S.Ct., at 1885-1886 (Harlan, J., concurring); id., at 34, 88 S.Ct., at 1886 (WHITE, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. United States v. Mendenhall, supra, 446 U.S., at 556, 100 S.Ct., at 1878 (opinion of Stewart, J.). If there is no detention  no seizure within the meaning of the Fourth Amendment  then no constitutional rights have been infringed.
In this case, the defendant had not been "stopped" or "seized" as those terms are commonly understood. Nevertheless, if his *185 consent to the search was "coerced," a motion to suppress should be granted, and the wrongfully obtained evidence excluded. Schneckloth v. Bustamonte.
Clearly, such evidence would not be suppressed if Avery had been similarly approached by these officers in an area of the bus station or platform rather than on the bus itself. See, e.g., Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, reh'g denied, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980); Rosa v. State, 508 So.2d 546 (Fla. 3d DCA), rev. denied, 515 So.2d 230 (Fla. 1987); Elsleger v. State, 503 So.2d 1367 (Fla. 4th DCA), dismissed, 511 So.2d 298 (Fla. 1987); State v. Champion, 383 So.2d 984 (Fla. 4th DCA 1980).
The state contends that Avery's consent was given in the course of an "encounter." See Florida v. Royer; United States v. Mendenhall; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It is undisputed that there is no "litmus-paper test" to be applied in distinguishing an "encounter" from a "seizure." Florida v. Royer, 460 U.S. at 506, 103 S.Ct. at 1329. The test is whether a reasonable person would feel free to terminate the encounter, given the totality of the circumstances. Mendenhall, 446 U.S. at 557, 100 S.Ct. at 1879; Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2048. In I.N.S. v. Delgado, 466 U.S. 210, 216-217, 104 S.Ct. 1758, 1762-63, 80 L.Ed.2d 247 (1984), the Supreme Court explained:
Although we have yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment, our recent decision in Royer, supra, plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. In Royer, when Drug Enforcement Administration agents found that the respondent matched a drug courier profile, the agents approached the defendant and asked him for his airplane ticket and driver's license, which the agents then examined. A majority of the Court believed that the request and examination of the documents were "permissible in themselves." Id., at 501, 103 S.Ct., at 1326 (plurality opinion), see id., at 523, n. 3, 103 S.Ct., at 1337-1338, n. 3 (opinion of REHNQUIST, J.). In contrast, a much different situation prevailed in Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), when two policemen physically detained the defendant to determine his identity, after the defendant refused the officers' request to identify himself. The Court held that absent some reasonable suspicion of misconduct, the detention of the defendant to determine his identity violated the defendant's Fourth Amendment right to be free from an unreasonable seizure. Id., at 52, 99 S.Ct. at 2641.
What is apparent from Royer and Brown is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Cf. Schneckloth v. Bustamonte, 412 U.S. 218, 231-234, 93 S.Ct. 2041, 2049-2051, 36 L.Ed.2d 854 (1973). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the persons [sic] refuses to answer and the police take additional steps  such as those taken in Brown  to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. United States v. Mendenhall, 446 U.S., at 554, 100 S.Ct., at 1877; see Terry v. Ohio, 392 U.S., at 21, 88 S.Ct., at 1879.
Law enforcement officers are not restricted from boarding buses or other public transportation with the permission of the operator. Being lawfully present, they *186 are free to communicate with the passengers. The location where an encounter takes place  whether on a bus, in a terminal, or in a room  is certainly a factor that the trial court should consider in weighing a motion to suppress. See I.N.S. v. Delgado; Florida v. Royer; United States v. Mendenhall. But the determination of whether there has been a seizure, or merely an encounter which a reasonable person would feel free to terminate, remains a question of fact to be determined from the totality of the circumstances. See I.N.S. v. Delgado; Florida v. Royer; United States v. Mendenhall; Schneckloth v. Bustamonte; Jacobson v. State, 476 So.2d 1282 (Fla. 1985); Martin v. State, 411 So.2d 169 (Fla. 1982); Denehy v. State, 400 So.2d 1216 (Fla. 1980); Rosa v. State, 508 So.2d 546 (Fla. 3d DCA), rev. denied, 515 So.2d 230 (Fla. 1987); Palmer v. State, 467 So.2d 1063 (Fla. 3d DCA 1985); State v. Grant, 392 So.2d 1362 (Fla. 4th DCA), rev. denied, 402 So.2d 610 (Fla. 1981).
A person's consent to a search is not per se involuntary because obtained by law enforcement officers on board a commercial carrier such as a bus or other similar forms of transportation. State v. Schwartzbach, 513 So.2d 756 (Fla. 4th DCA 1987). Generally, physical surroundings alone, or even the fact that a defendant has been taken into custody, is not sufficient to constitute coercion and vitiate consent. Cf. I.N.S. v. Delgado; United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, reh'g denied, 424 U.S. 979, 96 S.Ct. 1488, 47 L.Ed.2d 750 (1976). In Watson, the defendant had been arrested immediately before consenting to a search of his car. The Supreme Court reversed a decision of the Court of Appeals which had directed that the evidence be suppressed because the defendant's prior arrest was, by itself, coercive, and because of a lack of proof that defendant knew that he could withhold his consent to the search. The Supreme Court emphasized the applicability of the Schneckloth requirement that the defendant demonstrate that his consent to search "was not his own `essentially free and unconstrained choice' because his `will ha[d] been overborne and his capacity for self-determination critically impaired.' Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)." Watson, 423 U.S. at 424, 96 S.Ct. at 828.[2]
In Delgado, the Supreme Court held that the I.N.S. had neither detained nor seized employees who were questioned during "factory surveys" seeking to locate illegal aliens, notwithstanding that the exits were "guarded" by some agents, while other agents, armed and with walkie talkies, disbursed systematically throughout the factories to question employees. Those employees giving unsatisfactory responses to the agents' questions were then asked to voluntarily produce immigration papers. The Supreme Court noted that the Court of Appeals had followed the opinion written by Justice Stewart in Mendenhall in concluding that a reasonable worker would have believed that he was not free to leave. The court, following Royer and Mendenhall, determined that there was no basis for distinguishing the questioning that occurred at the guarded exits from that which occurred inside the factory. It concluded that there had been no seizures, and that these surveys were permissible encounters, despite a psychological environment in which the alien worker might be thought to be afraid that he or she was not free to leave. The majority opinion noted that the Supreme Court has been cautious in defining the limits imposed by the *187 Fourth Amendment, "given the diversity" of potential encounters between officers and citizens. The opinion reiterated the standard adopted in Terry v. Ohio, that "[o]nly when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a `seizure' has occurred." Delgado, 466 U.S. at 215, 104 S.Ct. at 1762.
We note that even the random stopping of motor vehicles at roadblocks without cause has been found to pass constitutional muster when the detention procedure is designed to meet minimum standards. See United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); State v. Jones, 483 So.2d 433 (Fla. 1986).
We recognize that the ruling of the trial court on a motion to suppress comes to the appellate court with a presumption of correctness. McNamara v. State, 357 So.2d 410 (Fla. 1978). However, that burden is overcome in this case by the showing that there was no evidence of misconduct. See State v. Champion, 383 So.2d 984 (Fla. 4th DCA 1980). See also State v. Grant, 392 So.2d 1362 (Fla. 4th DCA), rev. denied, 402 So.2d 610 (Fla. 1981).
The order granting the motion to suppress in this case was not a resolution of the facts based upon a consideration of the totality of the circumstances. Rather, it is worded as a determination of law that consent to a luggage search by a passenger in a vehicle used for public transportation is "coerced" where the police board the vehicle solely for the purpose of randomly seeking such consent from the passengers.
Ordinarily, where there is no antecedent police misconduct, a consent to search need only be shown by a preponderance of the evidence. See generally Denehy v. State, 400 So.2d 1216 (Fla. 1980); Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987); Elsleger v. State, 503 So.2d 1367 (Fla. 4th DCA), dismissed, 511 So.2d 298 (Fla. 1987); State v. Blan, 489 So.2d 865 (Fla. 1st DCA 1986); State v. Fuksman, 468 So.2d 1067 (Fla. 3d DCA 1985). See also Rodriguez v. State, 519 So.2d 1079 (Fla. 1st DCA 1988); Acosta v. State, 519 So.2d 658, 661 n. 2 (Fla. 1st DCA 1988). However, the issue in this case is not what standard of proof to apply in determining the voluntariness of the consent to search, but whether the consent is the result of coercion per se under these circumstances.
The suppression of this otherwise admissible proof is not the result of any act of misconduct or improper communication by the authorities. The officers boarded the bus at the terminal. Their attention was drawn to Avery. They advised him of their purpose in questioning and seeking the cooperation of the passengers. They asked him if he would consent to the search of his luggage, and advised him that he could refuse. The defendant was not stopped, restrained nor otherwise detained. There were no weapons involved, and no inappropriate nor intimidating conduct or language was used. The defendant was not asked to move, nor was he physically prevented from moving. His ticket and license were not confiscated.
It is not argued that the trial court's decision was based on weighing credibility. The trial court did not dispute the state's evidence. The suppression was not based on the officer's failure to impart any warnings or furnish any information to the defendant. The order assumes that Avery consented to the search and focuses on the "coercion" which the court deemed inherent in such a situation.
This court has previously affirmed orders denying motions to suppress evidence uncovered in a search conducted with the consent of bus passengers. See Hunter v. State, 518 So.2d 304 (Fla. 4th DCA 1987); Bostick v. State, 510 So.2d 321 (Fla. 4th DCA 1987); Snider v. State, 501 So.2d 609 (Fla. 4th DCA 1986); Rodriguez v. State, 494 So.2d 496 (Fla. 4th DCA 1986). One need not be unsympathetic to the concerns of the experienced trial judge, or to those expressed by judges of this court in the concurring and dissenting opinions in Bostick, Snider, and Hunter, as well as those similarly expressed in State v. Schwartzbach, 513 So.2d 756 (Fla. 4th DCA 1987), Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987), and State v. Carroll, 510 So.2d 1133 *188 (Fla. 4th DCA 1987), to recognize that trial courts should not apply a bright line standard in determining whether consent was coerced. Cf. State v. Schwartzbach.
We certify the following question to the supreme court as one of great public importance:
MAY EVIDENCE, OBTAINED AS A RESULT OF DEFENDANT'S CONSENT TO SEARCH, BE SUPPRESSED BY THE TRIAL COURT AS "COERCED" UPON THE SOLE GROUND THAT THE OFFICER(S) BOARDED A BUS (OR OTHER PUBLIC TRANSPORT) AND RANDOMLY SOUGHT CONSENT FROM PASSENGERS?
We therefore reverse and remand for further proceedings.
HERSEY, C.J., and DOWNEY, DELL, WALDEN and GUNTHER, JJ., concur.
LETTS, J., concurs specially with opinion.
GLICKSTEIN, J., concurs with certified question and dissents with opinion.
ANSTEAD, J., dissents with opinion.
LETTS, Judge, concurring specially.
Judge Glickstein's call for a per se rule outlawing requests for consent to search in situations where there are no articulable suspicions is beguiling, but at our level I doubt we are free to adopt it. As was noted in the dissent in Bostick quoting Royer, there is no litmus test to distinguish between a consensual encounter and a seizure. Likewise in Mendenhall, it is clear that whether it is a consensual encounter or a seizure requires consideration of the individual facts and circumstances of each incident. It would appear, therefore, that we cannot adopt a per se rule, unless we are to make a distinction between the quality of freedom to leave in a bus station vis-a-vis a bus seat.
I am also concerned about the several courts' dogged persistence that the result is dictated by freedom to leave. Clearly that is what has been said, but I fancy that freedom to terminate the interview would prove to be a better test. One about to embark, or continue, on a journey is not in my view reasonably free to leave and abandon the journey.
In the case at bar, had the trial judge concluded that the search was coercive under all the facts and circumstances, I would vote for affirmance. He did not do that, however, and instead adopted a per se coercive rule. While I have leanings in favor of such a rule, I believe he exceeded his prerogative under the case law.
Finally, my misgivings about this particular case are also assuaged by the fact that there may well have been an articulable suspicion present. There is unchallenged testimony that when the officers first boarded the bus, before any request to search was made, the defendant was very nervous, was "squirming" and "trying to conceal the bag under his seat."
GLICKSTEIN, Judge, concurring as to the certified question and dissenting as to the remainder.
I concur with certification of the question as one of great public importance. Otherwise, I dissent.
My thoughts on the present issue, having sprung initially during oral argument in Snider v. State, 501 So.2d 609 (Fla. 4th DCA 1986), were perhaps not very articulate in State v. Carroll, 510 So.2d 1133 (Fla. 4th DCA 1987), and Hunter v. State, 518 So.2d 304 (Fla. 4th DCA 1987). That is unfortunate, given the importance of the issue. Nevertheless, I now feel that only a per se rule will stop what is occurring. Without it, we shall be deciding these cases endlessly ad hoc, without any hope of uniformity. I base this conclusion on the history of "boarded passenger" cases in this court, which I list chronologically:
1. Rodriguez v. State, 494 So.2d 496 (Fla. 4th DCA 1986).
2. Snider v. State, supra.
3. Bostick v. State (I), the original PCA, issued April 8, 1987, but not reported in F.L.W.
*189 4. Hunter v. State (I), the original opinion which was to be issued on April 22, 1987, and was pulled by Judge Anstead. It is quoted verbatim in my concurrence in Hunter v. State (II).
5. Bostick v. State (II), on rehearing, containing a certified question, 510 So.2d 321 (Fla. 4th DCA 1987).
6. State v. Carroll, supra.
7. Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987).
8. State v. Schwartzbach, 513 So.2d 756 (Fla. 4th DCA 1987).
9. Hunter v. State (II), supra.
I requested that Avery be decided en banc because I perceived the issue to be of great importance and the results to require uniformity. The majority of the judges agreed, but the outcome of our en banc decision is the same as that of the majority on the original panel.
A specially concurring colleague doubts whether "at our level ... we are free to adopt" a per se rule outlawing requests for consent to search absent an articulable suspicion. Unless this question has been directly addressed and decided otherwise by the United States Supreme Court or the Supreme Court of Florida, I know of no reason why this court, which for most causes coming before it is the court of last resort, may not state the law as it sees it. Hoffman v. Jones, 280 So.2d 431, 433-34 (Fla. 1973), states merely that a district court of appeal may not overrule controlling precedent set down by the Florida Supreme Court; and we are aware of the effects of the 1982 amendment to article I, section 12 of the Florida Constitution.
Avery was the appropriate case to en banc. We now see that local police officers in South Florida are boarding interstate buses at stops in Broward and Palm Beach Counties, knowing there is a stopover of no more than twenty and often no more than ten minutes, going to the rear of the passenger section, and proceeding to ask every passenger for consent to search their baggage. The so-called war on drugs may unwittingly have become a war upon a prized element of our democracy  the right to be let alone.
Justice Brandeis observed, "A judge rarely performs his functions adequately unless the case before him is adequately presented." There appears to be little authority, however, that is factually on point. As a result, the trial judges and the judges on this court have used a variety of terms and expressions in framing and deciding the issues. In reviewing the court's records on this issue, I located authority in two Bostick briefs which I shared with the court at our en banc conference. One case, United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), discussed hereinafter, found its way into the en banc majority opinion, but the critical case, United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), did not.
A starting point, at least for me, is Justice Brennan's concurrence in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which defines the elements of a legitimate "stop." I have cited it in my concurrence in In re Forfeiture of 1984 Toyota Pick-up, 501 So.2d 610 (Fla. 4th DCA 1986).

[A] police officer with reasonable suspicion of criminal activity, based on articulable facts, may detain a suspect briefly for purposes of limited questioning and, in so doing, may conduct a brief "frisk" of the suspect to protect himself from concealed weapons.
(citations omitted) (emphasis added). 501 So.2d at 611. I then quoted the following language of Justice Brennan, to which I now add emphasis:

Terry encounters must be brief; the suspect must not be moved or asked to move more than a short distance; physical searches are permitted only to the extent necessary to protect the police officers involved during the encounter; and most importantly, the suspect must be free to leave after a short time and to decline to answer the question put to him.
"[T]he person may be briefly detained against his will while pertinent questions are directed to him. Of course, *190 the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." Id., at 34, 88 S.Ct., at 1886 (WHITE, J., concurring).
Failure to observe these limitations converts a Terry encounter into the sort of detention that can be justified only by probable cause to believe that a crime has been committed. See Florida v. Royer, 460 U.S., at 501, 103 S.Ct., at 1326 (opinion of WHITE, J.): id, at 509-511, 103 S.Ct., at 1330 (opinion of BRENNAN, J.); Dunaway v. New York, 442 U.S., at 216, 99 S.Ct. at 2258.
461 U.S. at 363-65, 103 S.Ct. at 1861-62, 75 L.Ed.2d at 912-14 [Footnotes omitted].
Id. at 612.
One deduces that the majority here believes one is free to leave a bus, train, airplane, or boat after boarding. Thus, in the Avery scenario, someone who boarded the bus which was travelling from Dade County to Dallas, would be "free to leave" at a Broward County terminal, wherever they boarded or whatever their destination. Does the majority perceive no constitutional difference between an individual standing in a bus or train station, airport, or marina before getting aboard a conveyance, and one who has boarded a bus  particularly one who boarded it at an earlier stop? What if the bus driver collected one's ticket, or punched it, or kept part of it and gave the passenger a stub? Do the narrow aisles of interstate buses as readily as the broad corridors of an air terminal accommodate breaking off a gratuitous police encounter? See Mendenhall and Royer. Finally, is the next step to bring a drug dog aboard each bus to sniff all the luggage?
Earlier herein, I referred to my discussion at conference of United States v. Martinez-Fuerte, which contains a major distinction from United States v. Brignoni-Ponce. The latter case quoted Terry for the following proposition:
[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.
Id. at 878, 95 S.Ct. at 2578. The court then said:
We are unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving patrol stops.
(Footnote omitted) (emphasis added). Id. at 882, 95 S.Ct. at 2580. The court then pointed out a number of considerations which I feel have their counterparts in "boarded passenger" cases:
1. The roads near borders carry a large volume of legitimate traffic. So do buses.
2. Substantially all of the automobile traffic in large metropolitan areas is lawful. So is the travel of most bus passengers.
3. To approve roving patrol stops without suspicion that an automobile in carrying illegal immigrants would subject residents to potentially unlimited interference with highway use, solely at the discretion of Border Patrol Officers. Avery "stops" may not interdict highway use, but certainly interfere with relaxed travel by bus passengers.
4. Approval of random stops implies motorists may be questioned day or night, without any reason to suspect them. Random inquiries of bus passengers have a comparable result.
In Martinez-Fuerte, the court approved stops at regular checkpoints and acknowledged they were "seizures." It contrasted random stops, which it had earlier disapproved, because of the grave danger that officers would abuse "unreviewable discretion." It took pains to point out that regular checkpoints do not take motorists by surprise. With the majority decision in Avery, why should not officers be able to stop automobiles at random and ask the same questions they are asking bus passengers?
Justice Brennan's dissenting concerns in Martinez-Fuerte, in which Justice Marshall *191 joined, should be considered by the majority:
Consistent with this purpose to debilitate Fourth Amendment protections, the Court's decision today virtually empties the Amendment of its reasonableness requirement by holding that law enforcement officials manning fixed checkpoint stations who make standardless seizures of persons do not violate the Amendment. This holding cannot be squared with this Court's recent decisions in United States v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); and Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). I dissent.
Id. at 568-69, 96 S.Ct. at 3088, 49 L.Ed.2d at 1134-35. Further, he wrote:
This defacement of Fourth Amendment protections is arrived at by a balancing process that overwhelms the individual's protection against unwarranted official intrusion by a governmental interest said to justify the search and seizure. But that method is only a convenient cover for condoning arbitrary official conduct, for the governmental interests relied on as warranting intrusion here are the same as those in Almeida-Sanchez and Ortiz, which required a showing of probable cause for roving-patrol and fixed checkpoint searches, and Brignoni-Ponce, which required at least a showing of reasonable suspicion based on specific articulable facts to justify roving-patrol stops. Absent some difference in the nature of the intrusion, the same minimal requirement should be imposed for checkpoint stops.
Id. at 570, 96 S.Ct. at 3088-89, 49 L.Ed.2d at 1135.
I urge the majority also to consider the concerns of Justice Douglas in his concurrence in United States v. Brignoni-Ponce, quoted in the writer's dissent in Ewen v. State, 518 So.2d 1285 (Fla. 4th DCA 1988).
The majority en banc opinion will now represent the law of this district. Unhappily, it is contrary to my values and those of some trial judges in this district, with whose conclusions I agree. Those orders previously before this court on this issue warrant discussion because an appellate court may take judicial notice of its own records. See, e.g., Arnold Lumber Co. v. Harris, 503 So.2d 925 (Fla. 1st DCA 1987) (court may take judicial notice of helpful context of briefs in another appeal to flesh out what the opinion in that case did not reveal). See also Foxworth v. Wainwright, 167 So.2d 868 (Fla. 1964); Irvin v. Chapman, 75 So.2d 591 (Fla. 1954); and Collingsworth v. Mayo, 37 So.2d 696 (Fla. 1948).
Circuit Judge Marvin Mounts eloquently said in Schwartzbach that even if appellee had given his consent, it was coerced in the following situation:
The matter was before the Court on the Defendant's Motion to Suppress December 30, 1986, with Charles Burton, Assistant State Attorney representing the State and Paul Petillo, Assistant Public Defender, representing the Defendant.
On August 6, 1986, the Defendant was seated in a Greyhound bus parked in the West Palm Beach Bus station when she was approached by two Palm Beach County Sheriff Deputies, Deputies Terry Marvin and Dale Allen. As part of their duties with the smuggling unit of the Sheriff's Office, Marvin and Allen would board northbound buses for the purpose of obtaining passengers' consent to search their carry-on baggage.
Deputy Marvin testified that he initiated conversation with Defendant and asked her if she would consent to a search of her duffel bag. Deputy Marvin testified that he obtained oral consent; a written consent to search form was not used. Defendant was not advised she had the right to refuse consent.
By stipulation of counsel, part of Deputy Allen's deposition was to be heard and considered by the court on the Motion to Suppress. Deputy Allen stated in deposition that Deputy Marvin had asked Defendant if she "minded" if he searched her bag and that her answer was "yes, *192 sure." This would make the facts of this case almost indistinguishable from those in State v. Kassidy, 495 So.2d 907 (Fla. 3d DCA 1986) (no consent when Defendant asked "Do you mind if I search?" Defendant answered, "yeah."); and Robinson v. State, 388 So.2d 286 (Fla. 1st DCA 1980) ("Do you mind if I pat you down?" "Sure.")
Even assuming the Defendant consented to the search that consent must be voluntary and not the product of coercion. The prospect of being a seated passenger on a commercial public transportation vehicle and seeing police officers come on board with their badges prominently displayed checking each passenger is an intimidating and coercive situation in and of itself.
I find that even if consent was given in this case it was coerced by the situation I have just described.
The Motion to Suppress is Granted.
One can see from Schwartzbach and from Avery, also decided by Judge Mounts, with whose decision I agree, that missing in both cases is the retention of the passenger's driver's license during the detention, as had occurred in Carroll.
I also agree with the similar conclusions of other trial judges, the review of whose decisions has been abated, pending our decision in Avery.
There are answers to questions involved in the war on drugs which do not emasculate our democracy. The majority's decision here is not one of them. Most important is the fact that judicial opinions which effectively restrict constitutional rights have a way of providing authority for decisions promulgating successively greater restrictions.
The use made here by the majority of I.N.S. v. Delgado is a case in point. There a federal district court had denied factory workers an injunction against Immigration and Naturalization Service (INS) "factory surveys," a Court of Appeals had reversed, and the Supreme Court reversed that reversal. The essence of the holding in Delgado is that the actions of INS agents who, with the employer's consent, moved systematically through a factory, asking all employees their citizenship, and asking to see the papers of aliens, while other agents were at the exits, did not constitute seizure in terms of the Fourth Amendment. A significant factual and legal aspect of Delgado had to be the statutory authority of the INS to question any alien or person believed to be an alien as to his right to be or remain in the United States.
Much of the Delgado excerpt which the majority here quotes discusses the precedential cases by use of which the Delgado majority showed that officers' asking persons for identification is not per se a seizure. Yet the present majority expands Delgado to cover random drug interrogations, conducted by local officers, of passengers riding common carriers  not factory workers at their workplace  briefly stopped in their jurisdictions, where the question is not, "Who are you?" but, "May we look in your luggage for drugs?"
The immediate issue in the spate of cases of which Avery is representative is identification of the limits imposed on random police investigations by the Fourth Amendment and by Florida's article I, section 12. There is also, however, the broader  arguably, ineffable  subject of contemporary societal debate: how best to contain subversion, by the rampancy of illegal drugs, of our society and of the political institutions of neighboring countries.
We read of congressional plans to increase the interdictory role of the armed services, over the objection of those who fear the consequences of departing from the tradition of keeping the military out of law enforcement in civilian society. We see proposals to legalize drugs, even to put government into the drug business, in order to take away the lucrative profits that drive the illicit market. Such proposals pose at the least a moral dilemma; but they bring up also a question whose answer is not wholly known: How does the societal price of drug abuse as such compare with the price attributable solely to the fact that we have made drugs illegal? Analogy to the history of prohibition of alcoholic beverages is imperfect for at least *193 two reasons; first, because prohibition was largely a United States phenomenon, whereas trafficking in today's drugs of choice is prohibited in much of the world; and second, because alcohol abuse and alcoholism are not nearly so disruptive of community life as are drug abuse and drug addiction.
Some believe that an intolerable health cost would attach to the legalization of drugs. See Kerr, The Unspeakable Is Debated: Should Drugs be Legalized? N.Y. Times, May 15, 1988 § 1 at 1, 12 (national ed.).
The following quotation from a letter to the editor points up one danger of legalization:
The legalization of drugs might drive their prices down but would not deglamorize the lure of drugs. Would we then bother to provide treatment for the greater number of addicts who would be legally free to buy and use drugs? In fact, do we provide adequate treatment now for alcoholics?
Sheinbaum, Make Prevention the First Priority, N.Y. Times, May 14, 1988, at 14 (national ed.)
Verne L. Speirs, Administrator of the Justice Department's Office of Juvenile Justice and Delinquency Prevention (OJJDP) tries to put a good face on the current federal effort when he writes:
As a result of President Reagan's leadership and the Anti-Drug Abuse Act of 1986, many Federal agencies are focusing their efforts on reducing and preventing illegal drug use by juveniles.
Although the Office of Juvenile Justice and Delinquency Prevention received no additional funding from the Anti-Drug Abuse Act, the Office took the lead in coordinating all Federal programs dealing with illegal drug use by this country's youth.
Speirs, OJJDP Coordinates Federal Juvenile Drug Abuse Efforts, NIJ Reports, Mar./Apr. 1988, at 10. The key words to me are those which say that his office received no additional funding from the Anti-Drug Abuse Act.
Mere publicity about the dangers of drugs will accomplish little. As Speirs himself says, despite the efforts of parents, teachers, students and national and local leaders, 5,000 Americans daily join in the ranks of cocaine users. Id.
Admittedly, when the writer first wrote the following lines, he was not so prescient as to recognize the range of problems to which it might be relevant:
It would be society's greatest reward  tangibly and otherwise  were the future adult inhabitants of his state able to look back to the 1980's and reflect how their predecessors finally came to recognize the priority to be given the well being of children. Such future citizens would undoubtedly be the beneficiaries from (1) our present awareness that children are our most precious gift and entitled to enjoy the happiness which those adults responsible for them can provide; and that they are our only priceless commodity  the key to the well-being of society; and (2) our recognition that without prioritizing the physical, emotional and educational needs of children, all the efforts to eliminate crime, poverty and ignorance are only kneejerk, bandaid solutions which cure none of society's basic ills.
Costa v. Costa, 429 So.2d 1249, 1252 (Fla. 4th DCA 1983). Is this not also a guide-post on the road to solving the drug problem?
The war on drugs will not be won by plainclothes detectives asking transient bus passengers for permission to search their luggage. Our best hope is a massive prevention program, concentrating more on building young peoples' sense of self-worth than on scare tactics.

EPILOGUE
In 1982, at the urging of a conservative activist legislator, we Floridians tied our highest state court's hands, by limiting the breadth of the search and seizure provisions of our own Constitution to the Fourth Amendment constructions of our increasingly conservative activist highest United States court.
*194 Edwin M. Yoder, himself a southern conservative columnist, recently quoted Oliver Wendell Holmes in commenting upon the most recent intrusion by that Court into our individual lives, by way of our garbage cans:
"We have to choose," Holmes wrote in his Olmstead dissent, opposing a warrantless wiretap, "and for my part I think it a lesser evil that some criminals should escape than that the Government should play an ignoble part."
The emerging test of privacy expectations is pushing us rapidly toward a Catch-22. The search of Greenwood's garbage bags would violate Fourth Amendment rights, Justice White tells us, "only if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable."
The trickiness of this test is obvious. Every time the Court decides that someone's expectations of privacy are without "objectively reasonable" foundation, it shrinks the zone of privacy. And every time it shrinks the zone of privacy, it obviously shrinks what society will expect.
The pitfalls of this circular judicial logic were spotted from the outset  not long after the last Justice Harlan (a friend of privacy rights, it should be noted) developed the "expectations" test. If what society expects of the police and magistrates is the test, commended Prof. Anthony Amsterdam at the time, "the Government could diminish each person's subjective expectation of privacy merely by announcing half-hourly on television ... that we were all forthwith being placed under comprehensive electronic surveillance."
Precisely.
It may be of some urgency, given the state of public hysteria, to prosecute drug peddlers. But all shortcuts that expedite police work carry a cost. If garbage bags at the curb are now open to purloining and warrantless searches, what will be next? Garbage bags in the garage? It is easy to see how, as public expectations shrink, the Court could find justification for yet-greater intrusions, each feeding on the earlier one.
The Miami Herald, May 21, 1988, 23A.
ANSTEAD, Judge, dissenting.
Although I compliment the majority's effort to provide a rationale for approving "consent" searches conducted by the police at random on interstate buses in transit, I cannot agree with the majority's legal analysis or its application to the facts of this case.[3]

STANDARD OF REVIEW
Initially I disagree simply because the majority fails to honor the fundamental rule of appellate review that reviewing courts must interpret the evidence and reasonable inferences therefrom in a manner most favorable to sustain the trial court's ruling. McNamara v. State, 357 So.2d 410 (Fla. 1978). In contrast to the evaluation of the evidence and conclusion reached by the trial judge, the majority opinion evaluates the evidence and makes a factual finding that the alleged consent obtained by the police after boarding a bus and confronting the appellant was not coerced. In essence the majority substitutes its own view of the evidence for that of the trial judge. Hence, in the guise of criticizing the trial court's alleged adoption of a bright-line rule concerning such searches, the majority has itself adopted a bright-line rule approving, as a matter of law, all such bus searches.

ENCOUNTER OR DETENTION?
I believe the majority's legal and factual analysis is flawed. In my view the most vulnerable premise of the majority opinion is the implicit conclusion that the confrontation of Avery by the police constituted a permissive encounter rather than a detention. It is well established that if a police-citizen contact is found to be a permissive encounter, the police may search the traveler's *195 luggage with his consent notwithstanding the absence of an articulable suspicion of criminality. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the detention of a citizen violates his right to be free from an unreasonable seizure "absent some reasonable suspicion of misconduct." Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). To sustain a consent search conducted during a detention, unsupported by reasonable suspicion of misconduct, the state must produce clear and convincing evidence of a voluntary consent to search free of the taint of the improper detention. Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987).
The majority essentially rules as a matter of law that being a seated passenger subjected to particularized inquiry or to a sweep by police of all passengers on a bus cannot be sufficiently intimidating as to possibly vitiate a passenger's consent to have his bags searched. The majority holds:
The defendant was not stopped, restrained nor otherwise detained. There were no weapons involved,[4] and no inappropriate nor intimidating conduct or language was used. The defendant was not asked to move, nor was he physically prevented from moving.
[Majority opinion, p. 187]. In response to these conclusions, I tend to agree with the comments of Judge Letts made in his dissent in Bostick v. State, 510 So.2d 321, 323 (Fla. 4th DCA 1987):
Moreover, my version of common sense tells me that a paid and ticketed passenger will not voluntarily forfeit his destination and get up and exit a bus in the middle of his journey, during a temporary stopover while the policemen, one with a pouched gun in his hand, are standing over him in a narrow aisle asking him questions and requesting permission to search his luggage. It is not a question of whether he actually was free to leave, as all of us trained lawyers know he was. The test is whether a layman would reasonably be expected to believe he was free to leave under these circumstances. I conclude he would not.
My having decided that the defendant was not free to leave, it follows that the police questioning under the facts of this case constituted an illegal detention and a seizure. In the words of the Royer court, since the defendant "was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search." Id. 103 S.Ct. at 1329.
Nor do I find that the State has sustained its burden of establishing that any such taint was rendered harmless by a subsequent unequivocal break in the chain connecting the original seizure with the ensuing consent to search. On the contrary, the consent to the search was given immediately upon the heels of the illegal detention and no measurable break in the chain took place. See Elsleger v. State, 503 So.2d 1367 (Fla. 4th DCA 1987), and Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
Id. at 323-24. Judge Letts' views are consistent with the result and the privacy analysis we have previously utilized in evaluating a similar search on a train. See Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987). See also Hunter v. State, 518 So.2d 304 (Fla. 4th DCA 1987) (trial court's denial of motion to suppress approved where there is clear and convincing proof of voluntary consent to search). I would apply the same analysis here.

THE FACTS
Although the majority concedes in a footnote that there is a factual difference between consent given before and after boarding which the trial court may consider in weighing the totality of the circumstances, *196 its conclusion that the contact sub judice was an "encounter" ignores completely the particular circumstances presented by bus searches which would support a finding of detention rather than encounter. These factors include:
1) the contrast between access to an obviously public bus terminal and the interior of an interstate bus in transit where access to the latter is restricted to passengers with tickets or others having a good reason to be on board with the authorization of the bus company;
2) the novelty of a police search of a bus in this country and the unfamiliarity of many passengers with their right to refuse consent for a search by the police without having to fear arrest or other repercussions as a consequence of that refusal;
3) the tremendous authority placed in the hands of police officers to compel obedience to their requests and the peaceful deference to that authority urged upon our citizens. When uttered by a person in authority, a "may" often becomes a "must";
4) the implicit accusatory nature of a request by the police to search a particular passenger's luggage for illegal drugs;
5) the small area to which a seated passenger is confined and the resulting conspicuousness attendant to a passenger's attempt to publicly decline to give consent, to refuse further conversation with police or to leave a bus already filled with passengers;
6) the narrow aisles which are automatically "blocked" merely by the presence of a police officer even though the officer may not "intend" that his presence in the aisle should serve to "detain" the passengers whose bags he seeks to search;
7) the brief duration for which the bus is stopped before departure;[5]
8) the police officers' presence on board right up until the time that the bus is ready to depart, thereby making the passenger less likely to view exit and reentry onto the bus to be a reasonable alternative.
In my view, these factors support the trial court's findings and render questionable a conclusion that a reasonable passenger in transit would in fact have felt free to leave or to terminate the contact as would someone in the terminal.[6]

THE LAW
As noted above, the primary flaw in the legal analysis of the majority opinion is that it completely fails to address the issue of whether a reasonable person would feel free to leave under the prevailing circumstances, in spite of the fact that that language is utilized as the standard in all of the recent Supreme Court cases. INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, reh'g denied, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). The majority makes several broad and conclusory statements unsupported by analysis. On page 184, is the bald statement that Avery "had not been `stopped' or `seized' as those terms are commonly understood." Again on page 187: "The defendant was not stopped, restrained nor otherwise detained." Yet Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is quoted on page 9 for the principle that a seizure *197 has occurred when the police officer, "by means of physical force or show of authority" has restrained the liberty of a citizen.
The majority simply ignores the issue raised by Judge Letts as to whether the conduct of two police officers exhibiting the trappings of authority, standing in the narrow aisle of the bus, towering over a seated passenger, and asking for a ticket, identification and permission to search his luggage, is the "show of authority," referred to in Terry, or whether the average citizen would feel free to leave. Even Mendenhall, in which the detention was found not to be illegal, stated that the presence of more than one officer, display of weapons, and wearing of uniforms, may be circumstances which would indicate the passenger may think he was not free to leave. 446 U.S. at 554, 100 S.Ct. at 1877. Similarly, the Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), states that consent can be coerced by explicit or implicit means, and quotes Justice Traynor in holding that whether consent is given in response to "implied assertion of authority" is a question of fact. 93 S.Ct. at 2044. By failing to address this issue, the majority ignores the factual circumstances of the confrontation and the trial court's resolution of the facts.[7]
The majority repeatedly cites INS v. Delgado and appears to rely heavily on that case. Such reliance seems to be misplaced for several reasons. In Delgado, the INS conducted "factory sweeps" for the purpose of looking for illegal aliens. In two "surveys," the INS acted pursuant to warrants issued upon a showing of probable cause that numerous illegal aliens were employed at a particular factory owned by a certain garment company. The third survey was done at another factory of the same company, with the employer's consent. The INS agents were armed, displayed badges, and had walkie-talkies. Some agents were stationed at the exits. Delgado was decided by a five-member court. The majority held that there was no seizure of the entire work force during the duration of the surveys, nor was the individual questioning of respondents a seizure. Justices Brennan and Marshall concurred only in the former, not the latter part of the holding. 104 S.Ct. at 1767. Thus there were only three justices concurring in the majority holding that the individual questioning was not a seizure. Notably, the dissenters were of the opinion that the surveys demonstrated a "show of authority" and that a reasonable person would "feel compelled" to provide answers to the agents' questions. Id. at 1769. That part of the holding with which five justices agreed  that there was no seizure of the entire work force for the duration of the surveys  would only be helpful in the instant case if the trial court had found that all the passengers on the entire bus had been seized for the duration of the officers' questioning.
Furthermore, two of the surveys involved in Delgado were conducted pursuant to warrants issued on probable cause, and the third was conducted at another factory operated by the same company. In other words, the surveys were conducted with judicial authorization based on reasonable belief that illegal aliens were employed at those particular factories. Although it may be unwise to hang one's hat on this distinction (as the warrants did not identify any particular illegal aliens by name and the surveys affected all workers, even legal ones), at least the INS agents  unlike the officers in the case at bar  were not merely guessing that they would uncover illegal activity. The officers in Avery even lacked knowlege that any particular bus would be transporting an individual(s) engaged in illegal activity. If that were the case, Delgado would be more closely analagous to this case.
*198 The majority's injection into its opinion of one of the United States Supreme Court cases involving Border Patrol/motor vehicle stops, and then addressing it only cursorily, is also disconcerting. United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), and State v. Jones, 483 So.2d 433 (Fla. 1986) are cited on page 10, preceded by the statement that "random stopping of motor vehicles at roadblocks without cause" passes constitutional muster. A careful reading of Martinez-Fuerte does not lead to the same broad conclusion as that reached by the majority. Martinez-Fuerte involves permanent roadblocks at a border patrol checkpoint near the Mexican border. Since all cars are stopped at the checkpoints, the stops are not "random." The purpose of such checkpoints is to visually inspect for possible illegal aliens coming over the border. The Court approved such stops, even without articulable suspicion as to any particular car, because they are permanent and fixed and known to motorists in advance, and the concern or fright to travelers is minimal because other vehicles are also being stopped. Significantly, in another Border Patrol/motor vehicle stop case, the Court held that roving patrols may only stop vehicles if there are "specific articulable facts ... that reasonably warrant suspicion" that the particular vehicle contains illegal aliens. United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). The Court notes that legitimate motorists may be frightened if stopped at random by a roving patrol, and that such limited discretion in the police may be abused and cannot be allowed. Id; Martinez-Fuerte. Thus, the Supreme Court has differentiated between fixed, permanent stops known in advance which do not catch any motorist by surprise and which do not require articulable suspicion, versus random stops by roving patrols which do surprise and may frighten motorists and do require articulable suspicion. The situation in the case at bar seems obviously more analogous to the latter case, and would therefore seem to require articulable suspicion. Furthermore, the Florida Supreme Court held in State v. Jones, that law enforcement officials must issue written uniform guidelines which minimize the discretion of field officers before conducting DUI roadblocks; that there must be sufficient warning in advance of the stop; and that vehicles could not be stopped "selectively," 483 So.2d at 438, such as by roving patrols. Thus the majority's reference to Martinez-Fuerte and State v. Jones seems inapposite, since both cases  in different but similar situations  speak to the need for warning, and the need to prevent unbridled discretion on the part of law enforcement officers.
Judge Letts' "common sense" reaction to the circumstances presented here is similar to that of numerous trial judges in this district who have made similar observations while both granting and denying motions to suppress in bus search cases. For instance, in the order challenged in McPherson v. State, No. 87-2226 (Fla. 4th DCA), Judge Carl Harper, although denying a motion to suppress on the authority of Rodriguez v. State, 494 So.2d 496 (Fla. 4th DCA 1986), expressed serious concerns about the police conduct in his order:
In so ruling, I have some strong personal reservations about the drug interdiction program described herein, in spite of the fact that drug smuggling is a major problem in our society today. The procedure is inherently intrusive on a person's right of privacy. It invites abuse and tends to diminish fourth amendment protections. For example, how many times must a person be confronted with this procedure while he is traveling from Miami to New York City? And, where will it all end, i.e., can it be used on board airlines during a layover? Can police officers go through a neighborhood, knocking on doors and asking for consent to search houses and contents in their war against drugs?
It is in cases like this that we must confront the question of whether our system of government is really that different from systems prevailing in other countries where the routine boarding of public transportation and confrontation of passengers *199 by police officers is accepted without question. In my view our system is different, and better, because we indeed value our right of privacy, our right to be let alone, and we are willing to pay a heavy price to protect that right, including the abuse of that right by those who disseminate the poison of illegal drugs among us. Ultimately, perhaps, one of the greatest harms inflicted on our society by those persons will be the loss of personal freedoms forfeited voluntarily by many in desperation and frustration at our inability to otherwise solve the "drug problem" within our own society.
NOTES
[1] This appeal may also appropriately be considered en banc in order to maintain uniformity in this court's decisions to the extent that any language in Hunter v. State, 518 So.2d 304 (Fla. 4th DCA 1987), and Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987), may be inconsistent with this opinion.
[2] The dissent inquires whether the majority perceives no difference between consent given before and after boarding. There is obviously a factual difference which the trial court may consider in weighing the totality of the circumstances. The issue before this court is not whether the judges individually approve of the procedure in question, but whether it constitutes per se, coercion. A passenger on a crowded bus is not, as a matter of law, necessarily more threatened, or less free to say anything, or nothing, to the officer, than is the same individual, alone, on a station platform, in a hallway, in a room, or on a country road. For example, in Rodriguez v. State, 519 So.2d 1079 (Fla. 1st DCA 1988), the denial of a motion to suppress was affirmed where, after a highway traffic stop, an officer, on mere suspicion, sought and received valid consent to search the trunk.
[3] As exemplified by the opinion in Rodriguez v. State, 494 So.2d 496 (Fla. 4th DCA 1986), and Bostick v. State, 510 So.2d 321 (Fla. 4th DCA 1987), this court has decided many bus search cases without providing any rationale for its decision.
[4] It should be noted that the officer testified not that there were no weapons involved, but rather that they had "no guns exposed."
[5] The police officers testified that they only had ten minutes to check the bus during the boarding operation.
[6] Without a determination that the subject search was consensual pursuant to an encounter, the trial court would have had to consider whether the search was permissible as one pursuant to a "detention" based on an articulable suspicion. Noteworthy on this issue is the lack of any challenge to the trial court's express statement to the effect that the facts presented here did not support a finding of "articulable suspicion." That conclusion too found support by substantial competent testimony by the police officer that all bus passengers must stow carry-on bags under their seats and that it is not at all unusual that a passenger would accomplish that by shoving his bags under the seat with his feet and would then rest his feet on the bag for lack of other floor space.
[7] Another issue ignored by the majority is the extent of the consent, if any, given to search Avery's luggage. It appears factually that any consent sought and obtained was to "look through" the luggage, not to forcibly tear open a sealed and wrapped container. See Horvitz v. State, 433 So.2d 545 (Fla. 4th DCA 1983); State v. Cross, 13 F.L.W. 270 (Fla. 3d DCA Jan. 26, 1988).