554 So.2d 1153 (1989)
Terrance BOSTICK, Petitioner,
v.
STATE of Florida, Respondent.
No. 70996.
Supreme Court of Florida.
November 30, 1989.
Rehearing Denied January 29, 1990.
*1154 Kenneth P. Speiller of the Law Offices of Max P. Engel, Miami, for petitioner.
Robert A. Butterworth, Atty. Gen., and Georgina Jimenez-Orosa, Asst. Atty. Gen., West Palm Beach, for respondent.
Edward A. Hanna, Jr., Fort Lauderdale, amicus curiae for Honorable Nick Navarro, Sheriff.
Joseph S. Paglino of the Law Office of Joseph S. Paglino, Miami, amicus curiae.
BARKETT, Justice.
We have for review Bostick v. State, 510 So.2d 321 (Fla. 4th DCA 1987), in which the district court certified the following question to be of great public importance:[1]
May the police without articulable suspicion board a bus and ask at random, for, and receive consent to search a passenger's luggage where they advise the passenger that he has the right to refuse consent to search?
Id. at 322. We rephrase the question as follows:
Does an impermissible seizure result when police mount a drug search on buses during scheduled stops and question boarded passengers without articulable reasons for doing so, thereby obtaining consent to search the passengers' luggage?
We answer the certified question in the affirmative and quash the opinion of the district court.
The facts in this case are succinctly stated by Judge Letts in his dissenting opinion[2] below:
Two [Broward County sheriff's] officers, complete with badges, insignia and one of them holding a recognizable zipper pouch, containing a pistol, boarded a bus bound from Miami to Atlanta during a stopover in Fort Lauderdale. Eyeing the passengers, the officers, admittedly without articulable suspicion, picked out the defendant passenger and asked to inspect his ticket and identification. The ticket, from Miami to Atlanta, matched the defendant's identification and both were immediately returned to him as unremarkable. However, the two police officers persisted and explained their presence as narcotic agents on the lookout for illegal drugs. In pursuit of that aim, they then requested the defendant's consent to search his luggage. Needless to say, there is conflict in the evidence about whether the defendant consented to the search of the second bag in which the contraband was found and as to whether he was informed of his right to refuse consent. However, any conflict must be resolved in favor of the state, it *1155 being a question of fact decided by the trial judge.
Id. (Letts, J., dissenting in part, footnote omitted).
The issue in this case arises out of the perpetual conflict between, on one hand, the right of an individual to be free from governmental interference and, on the other hand, the need of government to ensure the safety of its citizens. We start with the premise that every natural person has the inalienable right to live his or her life unimpeded by others. Each individual has the right to choose whether and with whom he or she will share personal information, conversation, or any other interaction personal to oneself. This right of personal autonomy or privacy, however, is forfeited when an individual acts to harm another. Thus, when the state has reason to believe that an individual has committed a crime, the state has the power to interfere with that individual's autonomy through a seizure or a search. However, this power must be exercised within certain constitutional constraints.
One such constraint is article I, section 12 of the Florida Constitution, and its counterpart, the fourth amendment of the United States Constitution. Both guarantee the right to be free from unreasonable searches and seizures, and both apply to all "seizures" of the person, including arrests and brief detentions. In the words of Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), they apply to those situations when an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." As Justice Stewart wrote in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion):
[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.
Id. at 554, 100 S.Ct. at 1877 (footnote omitted). A majority of the Court has since embraced this formulation. Immigration and Naturalization Serv. v. Delgado, 466 U.S. 210, 228, 104 S.Ct. 1758, 1768, 80 L.Ed.2d 247 (1984).
The purpose of this admittedly imprecise test is clear: "to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Michigan v. Chesternut, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). Thus, a seizure is not limited to physical custody but may be effected by "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877.
Against the backdrop of this imprecise definition of "seizure," the courts have established a continuum by which to gauge police activity alleged to constitute an improper seizure. From this continuum have come three broad lines of case law.
The first deals with the most severe seizures, most often described as "arrests." Full-fledged arrest, usually resulting in an indefinite detention of the person, is justified only when probable cause exists. Dunaway v. New York, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). "Probable cause" means that the circumstances are such as to cause a person of reasonable caution to believe that an offense has been or is being committed by the person to be arrested. Id. at 208 n. 9, 99 S.Ct. at 2254 n. 9. The "totality of the circumstances" must yield "a particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing."[3]United States v. Cortez, 449 U.S. 411, 418, *1156 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Moreover, the stop must have been "justified at its inception." United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (citation omitted).
The second line of cases deals with the less severe intrusions upon personal rights caused by brief, investigatory stops. Such stops fall into several categories. In Terry, for instance, the United States Supreme Court recognized that police may briefly stop and question those reasonably suspected of committing or about to commit a crime and frisk those reasonably suspected of carrying a weapon. Terry, 392 U.S. at 27, 88 S.Ct. at 1883. The rationale of Terry was that the brief intrusion upon an individual under these circumstances was counterbalanced by the government's interest in ensuring the safety of its police officers and of the public in general.
The basic rationale of Terry has been extended to other contexts. The Court, for example, has used it to justify brief automobile stops when police had articulable suspicion that illegal aliens were present. Cortez, 449 U.S. at 421, 101 S.Ct. at 696. The same rationale underlies a number of decisions permitting brief stops in airport terminals of persons engaging in out-of-the-ordinary acts that usually indicate trafficking in illicit drugs.[4]E.g., United States v. Sokolow, ___ U.S. ___, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).
The third line of cases involves those situations in which an individual actually consented to the police intrusion upon his or her personal rights. In these cases, the individual clearly understood that he or she could decline the police contact and continue on. If an individual chooses to speak with police and ultimately consents to a search, no "seizure" has occurred. Thus, the state has not engaged in coercion, and no fourth amendment violation exists. For instance, neither the state nor federal constitutions are offended when agents of the state approach an individual on the street or in another public place, ask questions without intimidation, and offer the voluntary answers to those questions into evidence in a criminal prosecution. Florida v. Rodriguez, 469 U.S. 1, 5-6, 105 S.Ct. 308, 310-311, 83 L.Ed.2d 165 (1984); Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983).
In the present case, the state contends that the initial contact by Officers Nutt and Rubino never rose to the level of a stop or detention that implicated Bostick's fourth amendment interests. What did occur, the state argues, was a consensual encounter meeting all the criteria for voluntariness prescribed under Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and Norman v. State, 379 So.2d 643 (Fla. 1980).
We disagree. We find, first, that Bostick in fact was "seized" by the officers and, second, that any consent he gave to search his luggage was not free from the taint of the illegal detention.
We have no doubt that the Sheriff's Department's standard procedure of "working the buses" is an investigative practice implicating the protections against unreasonable seizures of the person. U.S. Const. amend. IV; art. I, § 12, Fla. Const. There is no doubt that these protections extend to the traveling public, see Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925), including those who travel in vehicles, Brinegar v. United States, 338 U.S. 160, 176-77, 69 S.Ct. 1302, 1311-12, 93 L.Ed. 1879 (1949), or vehicles for hire. See, e.g., Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) (involving taxicab). The passenger, as Professor LaFave has *1157 observed, "shares with the driver a privacy interest in continuing his travels without governmental intrusion." 3 W. LaFave, Search and Seizure § 11.3(e), at 571 (1978). See also J. Choper, Y. Kamisar & L. Tribe, The Supreme Court; Trends and Developments 1978-79, 160-61 (1978). Moreover, there is a well-established privacy interest in the luggage one carries during travels. United States v. Chadwick, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977); United States v. Hernandez-Salazar, 813 F.2d 1126, 1136 (11th Cir.1987) (quoting United States v. Goldstein, 635 F.2d 356, 361 (5th Cir.), cert. denied, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981)); State v. Wells, 539 So.2d 464, 468 (Fla.) (on rehearing), cert. granted, ___ U.S. ___, 109 S.Ct. 3183, 105 L.Ed.2d 692 (1989).
There also is no doubt that the setting in which the challenged police conduct occurs may provide strong evidence of a "seizure." As noted in Chesternut, 108 S.Ct. at 1979, "what constitutes a restraint on liberty prompting a person to conclude that he is not free to `leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." The crucial question is whether, under all the circumstances, a reasonable person would have believed he was not free to leave. Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877.
Here, the circumstances indicate that the officers effectively "seized" Bostick. Officer Nutt testified that he and Officer Rubino, wearing raid jackets clearly identifying them as sheriff's officers, approached Bostick during the course of the bus's momentary layover in Fort Lauderdale. Bostick, who was resting on a bag in the rearmost seat, was asked to produce his identification and indicate his destination. During questioning, Officer Nutt stood in a position that partially blocked the only possible exit from the bus. At the time, Bostick testified that Officer Nutt had his hand in a black pouch that appeared to contain a gun. Because Bostick was en route to Atlanta, he could not leave the bus, which was soon to depart. He had only the confines of the bus itself in which to move about, had he felt the officers would let him do so.
Under such circumstances a reasonable traveler would not have felt that he was "free to leave" or that he was "free to disregard the questions and walk away." Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877. There was, in fact, no place to which a reasonable traveler might leave and no place to which he or she might walk away. The fact that the officers partially blocked the aisle and that one appeared to carry a gun only underscore this conclusion. Even the trial court in the proceeding below concluded that this situation was "very intimidating" for Bostick. For all intent and purpose, Bostick was detained by the activities of Officers Nutt and Rubino. Although, this detention did not rise to the level of an "arrest," it nevertheless constituted a lesser form of "seizure" of Bostick's person.
Other Florida cases involving the same Broward County policy support this conclusion. For example, under very similar facts in Alvarez v. State, 515 So.2d 286 (Fla. 4th DCA 1987), the Fourth District made the following comment about the Sheriff's Department's activities in boarding Amtrak trains in Fort Lauderdale:
[The defendant] was not in a public terminal, but rather had already boarded the train and begun his journey. To leave in the sense contemplated by Terry and Mendenhall would have required him to abandon the comfort of the sleeping berth he had paid for, and, were he to leave the train entirely, to miss his destination. His only other option was to ask the officers to leave.
Id. at 289. Thus, the Fourth District concluded that the police activity in Alvarez was "the functional equivalent of detention for purposes of determining the voluntary nature of the subsequent consent." Id. We agree with this analysis.
Since we have found a detention of Bostick, we must determine its propriety. The broad principles of federal law, as well as the specific requirements of Florida law, require that the police in this instance at a *1158 minimum must have had a reasonable articulable suspicion before they detained Bostick. Sokolow; Cortez; art. I, § 12, Fla. Const. There must be "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" of crime. Brignoni-Ponce, 422 U.S. at 884, 95 S.Ct. at 2582.
In this instance, the state concedes that it lacked any basis for suspecting illegal activity whatsoever. Thus, our inquiry is at an end. There were no articulable facts and no rational inferences to support the police activity involved here. The detention of Bostick was unlawful and unjustified.
Having decided that the initial confrontation was unlawful, we next consider whether Bostick's subsequent consent to search his luggage overcame the taint of the illegal police conduct. We find that it does not. As we stated in Norman v. State, 379 So.2d 643 (Fla. 1980):
[W]hen consent is obtained after illegal police activity such as an illegal search or arrest, the unlawful police action presumptively taints and renders involuntary any consent to search. The consent will be held voluntary only if there is clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior illegal action.

Id. at 646-47 (citations omitted, emphasis added). Accord Bailey v. State, 319 So.2d 22 (Fla. 1975); State v. Martin, 532 So.2d 95 (Fla. 4th DCA 1988); Alvarez, 515 So.2d at 286; Elsleger v. State, 503 So.2d 1367 (Fla. 4th DCA), dismissed, 511 So.2d 298 (Fla. 1987); State v. Blan, 489 So.2d 865 (Fla. 1st DCA 1986); Harris v. State, 483 So.2d 111 (Fla. 2d DCA 1986); Tennyson v. State, 469 So.2d 133 (Fla. 5th DCA 1985). No such clear and convincing proof exists upon this record. Indeed, the trial judge expressed his own belief that he considered the "whole picture ... very intimidating even if there is consent." It is clear that the trial court used the wrong standard in judging this issue. An "intimidating" environment cannot be said to have broken the chain of illegality even under a less exacting standard of proof than that dictated by Norman and its progeny. Thus, although the judge's finding of fact normally comes to this Court with a presumption of correctness, the presumption must fail in this instance.
Accordingly, we find that under the circumstances presented here, government has exceeded its power to interfere with the privacy of an individual citizen who is not even suspected of any criminal wrongdoing. Indeed, the unlawful intrusion upon privacy that occurred here is eloquently described by Judge Andrews, as quoted in State v. Kerwick, 512 So.2d 347 (Fla. 4th DCA 1987), when he confronted the same Broward County Sheriff's policy in dispute in this case:
"[T]he evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who held temporary power in the Government. The spectre of American citizens being asked, by badge-wielding police, for identification, travel papers  in short a raison d'etre  is foreign to any fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, nor Stalin's Moscow, nor is it white supremacist South Africa. Yet in Broward County, Florida, these police officers approach every person on board buses and trains (`that time permits') and check identification, tickets, ask to search luggage  all in the name of `voluntary cooperation' with law enforcement  to the shocking extent that just one officer, Damiano, admitted that during the previous nine months, he, himself, had searched in excess of three thousand bags! In the Court's opinion, the founders of the Republic would be thunderstruck."
Id. at 348-49 (quoting Judge Andrews, emphasis in original).
We agree. The intrusion upon privacy rights caused by the Broward County policy is too great for a democracy to sustain. Without doubt the inherently transient nature of drug courier activity presents difficult law enforcement problems. Roving *1159 patrols, random sweeps, and arbitrary searches or seizures would go far to eliminate such crime in this state. Nazi Germany, Soviet Russia, and Communist Cuba have demonstrated all too tellingly the effectiveness of such methods. Yet we are not a state that subscribes to the notion that ends justify means. History demonstrates that the adoption of repressive measures, even to eliminate a clear evil, usually results only in repression more mindless and terrifying than the evil that prompted them. Means have a disturbing tendency to become the end result. And as Judge Glickstein noted in his dissent in Snider v. State, 501 So.2d 609, 610 (Fla. 4th DCA 1986):
Occasionally the price we must pay to make innocent persons secure from unreasonable search and seizure of their persons or property is to let an offender go. Those who suffered harassment from King George III's forces would say that is not a great price to pay. So would residents of the numerous totalitarian and authoritarian states of our day.
For the foregoing reasons, we answer the certified question as rephrased in the affirmative. The opinion below is quashed, and we remand for further proceedings consistent with this opinion.
It is so ordered.
EHRLICH, C.J., and SHAW and KOGAN, JJ., concur.
McDONALD, J., dissents with an opinion, in which OVERTON and GRIMES, JJ., concur.
GRIMES, J., dissents with an opinion, in which OVERTON and McDONALD, JJ., concur.
McDONALD, Justice, dissenting.
One cannot complain of a search if he voluntarily consents to it. The majority, among other things, concludes that the consent given here is the result of coercion per se under the circumstances. I reject that view and conclude that whether there was a free and voluntary consent is a question of fact to be decided by the trial judge.
I totally disagree that there had been a seizure of Bostick and the logic of holding him to be seized completely escapes me.
To many the practice of police boarding a bus seeking evidence of transportation of drugs is distasteful. I can accept that, but find nothing illegal about it so long as there are no overt acts of threat or intimidation in the procurement of a consent to search. The entire war on drugs is distasteful and society should accept some minimal inconvenience and minimal incursion on their rights of privacy in that fight.
I would affirm Bostick's conviction. I would approve the decision of State v. Avery, 531 So.2d 182 (Fla. 4th DCA 1988).
OVERTON and GRIMES, JJ., concur.
GRIMES, Justice, dissenting.
I admit to a certain amount of discomfort in the prospect of the police routinely boarding stopped buses to inquire of the passengers whether they will consent to a search of their luggage. However, I know of no legal principle which would justify this Court in declaring the practice to be per se illegal.
The police are at liberty to approach an individual in a public place to ask him questions if the person is willing to listen. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Such an encounter only becomes a seizure if the person is detained without reasonable objective grounds for doing so. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The majority's suggestion that Bostick could not have felt free to leave and that in any event there was no place to go except to get off the bus is misplaced. On the facts of this case, the controlling question is whether a reasonable person would have felt free to terminate the encounter, given the totality of the circumstances. Id. The United States Supreme Court has said that there is no "litmus paper test" to be applied in distinguishing an encounter from a seizure. Royer.
*1160 In Immigration & Naturalization Service v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the Supreme Court held that the Immigration and Naturalization Service had neither detained nor seized employees who were questioned during "factory surveys" seeking to locate illegal aliens, even though the exits were "guarded" by some agents, while other agents, armed and with walkie talkies, dispersed systematically throughout the factories to question employees. Any employees giving unsatisfactory responses to the agents' questions were then asked to produce immigration papers voluntarily. The Court stated that "`[o]nly when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" Id. at 215, 104 S.Ct. at 1762 (quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)).
The position I take is similar to that expressed by six of the nine judges of the Fourth District Court of Appeal in the en banc decision of State v. Avery, 531 So.2d 182, 185-86 (Fla. 4th DCA 1988):
Law enforcement officers are not restricted from boarding buses or other public transportation with the permission of the operator. Being lawfully present, they are free to communicate with the passengers. The location where an encounter takes place  whether on a bus, in a terminal, or in a room  is certainly a factor that the trial court should consider in weighing a motion to suppress. See I.N.S. v. Delgado; Florida v. Royer; United States v. Mendenhall. But the determination of whether there has been a seizure, or merely an encounter which a reasonable person would feel free to terminate, remains a question of fact to be determined from the totality of the circumstances.
Whether there has been a voluntary consent is a question to be determined from the totality of the circumstances. Royer; Mendenhall; Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The extent to which a passenger may be intimidated by the police boarding a bus and seeking permission to check his luggage properly bears on whether the consent to search has been voluntarily given. But the ultimate question of whether the consent was voluntary is a question of fact. In this case the trial judge found that the consent to search had been voluntarily given.
I respectfully dissent.
OVERTON and McDONALD, JJ., concur.
NOTES
[1] We have discretionary jurisdiction under article V, section 3(b)(4), Florida Constitution.
[2] The majority of the district court below issued a per curiam affirmance, but agreed to certify the question. Bostick v. State, 510 So.2d 321, 321-22 (Fla. 4th DCA 1987). Thus, the majority opinion did not recite the facts of the case.
[3] It is irrelevant what label the government or its agents attach to a particular seizure. Every seizure bearing the attributes of an arrest is unreasonable and thus unlawful unless supported by probable cause, Michigan v. Summers, 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981), even if only for the purpose of custodial interrogation. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
[4] However, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), requires reasonable suspicion of specific wrongdoing. For instance, the Court has found unreasonable some investigatory stops based on mere presence in a neighborhood frequented by drug users, Brown v. Texas, 443 U.S. 47, 51-52, 99 S.Ct. 2637, 2640-2641, 61 L.Ed.2d 357 (1979), random spot checks on the public highway, Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979), the fact that a person appears to be Mexican, United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and dragnets. Davis v. Mississippi, 394 U.S. 721, 726-27, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969).