**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alaine DeCarlo FIELDS,**
**Defendant–Appellant.**

No. 89–8652.

United States Court of Appeals, Eleventh Circuit.

Aug. 20, 1990.

Stanley H. Friedman, Janna Martin, Savannah, Ga., for defendant-appellant.

Joseph Newman, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before HATCHETT, Circuit Judge, HILL* and FAIRCHILD**, Senior Circuit Judges.

HILL, Senior Circuit Judge:

State agents arrested the defendant, Alaine DeCarlo Fields, in Ft. Lauderdale, Florida, while he was travelling aboard a bus. Agents boarded the bus, explained that they were attempting to stem the flow of illicit drugs and firearms, and then asked passengers if they would consent to a random search of their baggage. In Fields' bag, agents discovered half a kilogram of cocaine. Fields now challenges the lawfulness of the agents' search. Constrained by precedent, we affirm.

---

\* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

FACTS

On April 24, 1989, the Broward County, Florida Sheriff's Office assigned Detectives Ramon Callazo and Peter Stephens to the Ft. Lauderdale bus terminal as part of that office's narcotics interdiction program. Under this program, the sheriff's department attempts to identify and arrest drug couriers by monitoring buses (and other forms of public transportation) heading north from Ft. Lauderdale, Florida. The sheriff's office trains its detectives to follow certain procedures when approaching and addressing passengers. For example, the sheriff's office instructs its detectives to secure the permission of the driver to board the bus, to introduce themselves as narcotics officers to various passengers on the bus, to explain that they are enlisting public assistance to stem the flow of illegal drugs and firearms, and then finally to request permission to conduct a consent search of the passenger's luggage. The sheriff's office also trains its detectives to stand to the side or slightly behind the seat of the passengers that they approach; thus passengers remain free to leave the bus if they wish to avoid questioning.

At about 2:15 p.m. on April 24, 1989, Detectives Callazo and Stephens boarded a north-bound bus that had just arrived from Miami, Florida. The detectives had received no prior tip or information which suggested that the defendant (or any other passenger) was carrying illicit drugs. The detectives, although casually dressed, wore jackets bearing the insignia of the Broward County Sheriff's Department. Both men were armed, but concealed their pistols beneath their jackets so that passengers could not observe the weapons. The agents, in accordance with their usual procedure, proceeded directly to the rear of the bus with the intention of working their way toward the front.

The appellant Fields occupied the window seat on the driver's side of the very rear of the bus. Detective Callazo approached

---

\*\* Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

him, explained that he and Detective Stephens were narcotics officers, and showed Fields (and a passenger seated next to him) his identification. The detectives, as the sheriff's office had instructed them, positioned themselves so that Fields' access to the front of the bus remained unimpeded.

Detective Callazo then informed Fields and his seatmate that law enforcement officials in Florida were enlisting the public's assistance and cooperation in obstructing the transportation of illegal narcotics and firearms on buses. He also explained that the officials were seeking the permission of passengers to conduct a search of their luggage. Detective Callazo emphasized that the search was "strictly voluntary," and stated that the passengers had the right to refuse to consent to the search.

At this point, the parties' stories diverge. Detective Callazo testified that he pointed to a black zippered bag located in the overhead rack, and asked if the bag belonged to Fields. Fields identified the bag as his own, and Detective Callazo repeated that he had a right to refuse the officers permission to search his luggage. The detective then asked Fields if he would consent to a search of his bag, and Fields replied, "Go ahead." Detective Callazo removed the bag from the overhead rack and placed it in Fields' lap, unzipped the bag and began to examine its contents. The detective immediately discovered a separate, smaller bag which he believed contained cocaine. Detective Callazo then placed Fields under arrest, and told him to accompany the officers off the bus. Fields replied, "Okay man, I'm not going to give you any trouble." Fields exited the bus, and the detectives, after advising him of his *Miranda* rights, placed him under arrest for the transportation of cocaine.

Fields' version of these events differs. At an evidentiary hearing, he stated that when the detectives approached the rear of the bus, they announced that they were law enforcement officers and that they "were going to conduct a search of the passengers' luggage." The detectives then selected and opened an item of luggage belonging to the passenger seated next to

him. According to Fields, only then did Detective Callazo ask that passenger if she would consent to a search of her bag. Fields also stated that neither detective indicated that the passengers had the right to refuse to consent to the search. At any rate, after the (female) passenger permitted a search of her luggage, the detective picked up her purse and again asked if she would consent to a search of her luggage. The passenger hesitated, and then consented. Detective Collazo next removed Fields' bag from the overhead rack and asked if it belonged to him. He (the detective) then placed the bag on the seat located just behind Fields, and began to unzip the bag. At this point, Detective Callazo asked Fields permission to search his bag; Fields concedes that he consented to the search. Fields also stated, however, that he consented only because he thought that the detective would search his bag regardless of whether he gave his permission or not. Fields stated that Detective Stephens (a much larger man than Fields), intimidated him by blocking his exit from the bus.

## PROCEEDINGS IN THE DISTRICT COURT

Fields filed a Motion to Suppress Evidence in the District Court for the Southern District of Georgia. A federal magistrate conducted a motion hearing on this issue on July 6, 1989, and filed a Report and Recommendation denying the motion on July 12, 1989. On July 28, 1989, the district court adopted this Report and Recommendation as its opinion.

On October 2, 1989, Fields entered a plea of guilty to possession of controlled substances with the intent to distribute them. (Fields' guilty plea remained subject to his right to appeal his motion to suppress). The district court then sentenced him to thirty-seven months incarceration, a $50.00 special assessment fee, and five years of supervised release.

This appeal followed.

## DISCUSSION

The appellant now challenges the district court's conclusion that he freely consented

to the detectives' search. As legions of courts have noted, questions of search, seizure and consent derive from "... the perpetual conflict between, on [the] one hand, the right of an individual to be free from governmental interference and, on the other hand, the need of government to ensure the safety of its citizens." *Bostick v. State of Florida*, 554 So.2d 1153, 1155 (Fla.1989). Thus, although the government may in certain situations interfere with a person's autonomy, it must do so within the confines of the Fourth Amendment, which guarantees that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches, shall not be violated...." In *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. Unit B 1982) (en banc), we concluded "... that Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause."

We begin by noting that although Fields' testimony at times conflicted with that of the detectives, we "of course may not weigh this conflicting evidence or make credibility choices among the witnesses." *Banco Nacional de Nicaragua v. Argonaut Insurance Co.*, 681 F.2d 1337, 1341 (11th Cir.1981). The district court found the detectives' testimony more credible than that of Fields, and we will not disturb that finding since substantial evidence supports it.

Fields also contends, however, that even under the district court's findings, he never "freely and voluntarily" consented to the detectives' search; he argues instead that the detectives effectively "seized" him. In support of this argument, Fields refers us to two recent opinions, which, although they do not bind this court, involve factual scenarios almost identical to our own. *See Bostick v. State of Florida*, 554 So.2d 1153 (Fla.1989); *United States v. Lewis*, 728 F.Supp. 784 (D.D.C.1990). In *Bostick*, 554 So.2d at 1157, the Florida Supreme Court

discussed, as we do, the drug interdiction efforts used by the Broward County Sheriff's Office, and emphasized the limited options available to bus passengers when government agents impede their progress:

> Because Bostick was en route to Atlanta, he could not leave the bus, which was soon to depart. He had only the confines of the bus itself in which to move about, had he felt the officers would let him do so.
>
> Under such circumstances a reasonable traveler would not have felt that he was "free to leave" or that he was "free to disregard the questions and walk away." (Citations omitted).

In a similar context, the District Court for the District of Columbia noted:

> The very nature of the encounter between Detective Hanson and Mr. Lewis placed the latter in a position in which he could reasonably believe that he was not free to walk away. To walk away from this encounter, Mr. Lewis, who was waiting for the bus to depart for his Richmond destination, would have had to stand up from his seat, work his way out of the narrow row in which he was situated, and then negotiate his way past Detective Hanson, who was positioned in the narrow exit aisle. In effect, he would have had to leave the bus, give up his seat, and lose his ability to travel to Richmond in accordance with his travel plans.

*Lewis*, 728 F.Supp. at 787.

These thoughtful opinions disturb us, and we note, as Fields urges, that they impose almost a blanket prohibition on drug interdiction efforts such as the one at issue here. We also note, however, that another panel of *this* circuit has already analyzed, and approved, Broward County's random searches of passengers on buses.

In *United States v. Hammock*, 860 F.2d 390, 393 (11th Cir.1988), we reviewed Broward County's procedures for the first time, and held that that appellant "would have felt free to leave the bus" in circumstances virtually identical to those involved in this case. In *Hammock*, we culled from

*United States v. Mendenhall,* 446 U.S. 544, 554–555, 100 S.Ct. 1870, 1877–1878, 64 L.Ed.2d 497 (1980) (Stewart & Rehnquist, J.J., concurring) and *United States v. Berry,* 670 F.2d 583, 587 (5th Cir. Unit B 1982) (en banc), a partial list of circumstances that would indicate an arrest, or coerced consent:

> These circumstances include the blocking of an individual's path or the impeding of his progress, the retention of a ticket or piece of identification; an officer's statement that the individual is the subject of an investigation, or that a truly innocent person would cooperate with the law enforcement officer, the display of weapons, the number of officers present and their demeanor, the length of the detention, and the extent to which the officer physically restrained the individual. (Citations omitted).

*Hammock,* 860 F.2d at 393.[1] Although we recognized in *Hammock* the difficulties generated by "the inherent limitations on a bus passenger's freedom of movement," we also concluded that drug interdiction efforts such as those used here were appropriate, especially where the officers "took great pains to ensure that passengers would feel free to exit." 860 F.2d at 393. Since *Hammock* involved not only the same procedures as those used in this case, but officers even from the same *county,* we can perceive no principled way for us to invalidate these procedures without ignoring the plain language of *Hammock.*[2] We

cannot today re-examine the holdings of *Hammock;* that is a function that only the full court, en banc, may perform. With the *Hammock* precedent in mind, we therefore hold that ample evidence supports the district court's conclusion that Fields freely and voluntarily consented to the detective's search.

## CONCLUSION

We AFFIRM the judgment of the district court.

AFFIRMED.

---

1. Fields notes that the detectives removed his bag from the overhead rack, and that his bag contained his bus ticket. Thus, he argues, the detectives retained his bus ticket in the manner anticipated, and discouraged, by this circuit in *United States v. Berry,* 670 F.2d at 597. We disagree. The detectives' brief retention of Fields' ticket was apparently accidental, and so did not fall within the scope of purposeful intimidation contemplated by *Berry.*

   Fields also argues that the detectives carried weapons, but we note that they were careful to conceal them. Concealed weapons do not constitute "the display of weapons" anticipated by *Hammock,* 860 F.2d at 393.

2. As a general matter, we note that most courts which discuss these issues focus on the officer's position on the bus, and the extent to which he might have inhibited a passenger's movements. In *our* view, however, an officer's location has little to do with the question of consent. The

real problem, as we see it, is that the officer is delaying the *progress* of the bus, and interfering with the public's right to travel, a right long recognized in this country as fundamental. *See e.g., United States v. Guest,* 383 U.S. 745, 757, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966).

We also note that although the officers may view themselves as militants in a new "war on drugs," (*see, e.g. Bostick,* 554 So.2d at 1159, (McDonald, J., dissenting)), the Fourth Amendment continues to limit their conduct. Any suppression rule, of course, excludes probative evidence which helps courts—and juries—determine the truth. Courts, on the other hand, by nature prefer to *establish* the truth. Although we understand the reluctance with which they relinquish this familiar function, we cannot permit that same reluctance to effectuate the gradual erosion of the Fourth Amendment.