576 So.2d 819 (1991)
STATE of Florida, Appellant,
v.
Margretta DANIELS, Appellee.
No. 90-0395.
District Court of Appeal of Florida, Fourth District.
March 13, 1991.
Rehearing Denied April 17, 1991.
*820 Robert A. Butterworth, Atty. Gen., Tallahassee, and Carol Cobourn Asbury, Asst. Atty. Gen., West Palm Beach, for appellant.
Richard L. Jorandby, Public Defender, and Marcy K. Allen, Asst. Public Defender, West Palm Beach, for appellee.
PER CURIAM.
The state appeals the trial court's order that granted appellee's motion to suppress physical evidence and statements.
Appellee Margretta Daniels [Daniels], a black woman, was seated on a bench at a train station in Fort Lauderdale waiting to board a northbound train. There were two pieces of luggage on the ground in front of her, a tote bag and a suitcase that her coat was draped over. A man and a woman *821 dressed in street clothes approached Daniels and identified themselves as Broward County Deputy Sheriffs. They asked Daniels if she had time to speak to them and asked to see her train ticket and some identification, which were promptly returned to her. The deputies then explained that the transportation of illegal drugs and firearms is a problem in South Florida and that they were seeking the public's cooperation by asking to search the luggage of train passengers. They told Daniels that she could refuse to allow them to search her luggage and asked if she had any luggage. Daniels indicated that the tote bag belonged to her and the gentleman sitting next to her, but she denied owning the suitcase. The gentleman consented to the search of the tote bag, but also denied owning the suitcase. Because no one claimed the suitcase, the deputies opened it and found papers in Daniels' name and cocaine. Daniels then claimed the suitcase belonged to her.

THE SEIZURE
Daniels relies on Bostick v. State, 554 So.2d 1153 (Fla. 1989). The issue in Bostick was whether an impermissible seizure results when police mount drug searches on buses during scheduled stops and question boarded passengers without articulable reasons for doing so, and thereby obtain consent to search the passenger's luggage. The supreme court found such conduct did result in an impermissible seizure. Id. at 1154. Citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) the supreme court stated that the crucial question is "whether, under all the circumstances, a reasonable person would have believed he was not free to leave." Id. at 1157.
The Bostick court considered the following circumstances: the officers were wearing raid jackets clearly identifying them as officers; Bostick was approached during a five minute layover; he was asked to produce his identification and indicate his destination; during questioning one of the officers stood in such a way as to block the only possible exit from the bus; Bostick testified that while the officers spoke with him, one of them had his hand on a pouch that appeared to contain a gun; because he was on his way to Atlanta, he could not leave the bus; he had only the confines of the bus itself in which to move about and he felt that the officers would not allow him to move about the bus. Under those circumstances, the supreme court concluded, a reasonable traveler would not have felt free to leave or to disregard the questions and walk away. In fact, the court noted, there was no place he might have gone to or walked away to, especially given the fact that his path was blocked by one officer and another had his hand on what Bostick assumed was a gun.
The state distinguishes the facts here from those in Bostick by pointing out that this encounter took place at the terminal with Daniels sitting on a bench and not on a bus or a train and that the encounter was not coercive because the officers made only a brief inquiry of Daniels, did not retain her identification, and did not block her path.
The state relies on Palmer v. State, 467 So.2d 1063 (Fla. 3d DCA 1985). In that case, officers approached Palmer at an Amtrak station, he voluntarily agreed to speak with the officers and allowed them to search his bag. The Palmer court found the encounter to be a mere contact that did not involve a constitutional seizure of Palmer's person, not requiring the existence of a prior founded suspicion of unlawful activity.
The state also relies on United States v. Fields, 909 F.2d 470 (11th Cir.1990). The Fields court disagreed with Bostick and found the opinion "disturbing." Id. at 473. The Fields court noted that the Eleventh Circuit had already approved Broward County's random searches of passengers on buses in United States v. Hammock, 860 F.2d 390, 393 (11th Cir.1988). The facts in Fields and in Hammock are identical to those in Bostick. The Fields opinion then provides a partial list of circumstances that would indicate an arrest or coerced consent:

*822 These circumstances include the blocking of an individual's path or the impeding of his progress, the retention of a ticket or piece of identification; an officer's statement that the individual is the subject of an investigation, or that a truly innocent person would cooperate with the law enforcement officer, the display of weapons, the number of officers present and their demeanor, the length of the detention, and the extent to which the officer physically restrained the individual.
Id. at 474 (quoting United States v. Hammock, 860 F.2d 390, 393 (11th Cir.1988)). Both the Fields and the Hammock opinions recognized the difficulties generated by what they termed "the inherent limitations on a bus passenger's freedom of movement," but concluded that drug interdiction efforts such as those used by Broward County were appropriate, especially where the officers were very careful to ensure that passengers would feel free to leave the bus. In a footnote the Fields court noted that most courts confronted with this issue focus on the position of the officers on the bus and the extent to which they might inhibit a passenger's movements. Id. at 474 n. 2. The opinion stresses that in the view of the Eleventh Circuit, the officer's location has little to do with the question of consent, the real problem being that the officer delays the progress of the bus while he remains on the bus and, thus, interferes with the public's right to travel. Id.
Sub judice, the trial court did not find that the officers blocked Daniels' path or impeded her progress, retained her ticket or her identification, advised her she was under investigation or that a truly innocent person would cooperate, displayed their weapons, or physically restrained Daniels. The trial court did consider the following factors before determining that Daniels had been illegally stopped by police: the stop occurred within five or ten minutes prior to the time her train was scheduled to leave the station; the officers involved were "positive, assertive individuals" whose demeanor reflected their well being; Daniels' shy nature and inbred, ingrained habits of acquiescence to apparent authority she had acquired as a result of having been raised in Ahoskie, North Carolina, an area of the country where blacks typically submit to the law enforcement authority of white individuals, and concluded that although she had lived in New York the past twelve to fifteen years, those years had not dispelled these inbred, ingrained habits. The court found Daniels' freedom of movement to have been restricted from the time when the officers sought to explain to her that she had a right to refuse to speak with them. The trial court then noted that the Amtrak Station in Fort Lauderdale is located in a high crime area, that it was not unreasonable for Daniels to conclude that she could not safely walk away from the station, and that she did not have the funds to call a taxicab.
Daniels' reliance on Bostick is misplaced. Bostick stands for the proposition that impermissible seizures occur when police board busses and question passengers aboard the busses without having an articulable reason for questioning them. Daniels was not on a bus where there are inherent limitations on a passenger's movements; she was not on a train, where there are also inherent limitations on a passenger's movements; she was at a train station. Based on Palmer, we hold that the encounter between Daniels and the deputies did not qualify as a seizure of Daniels within the meaning of the Fourth Amendment. The test is whether a reasonable person would have believed he was not free to leave, not whether the particular defendant would not have felt free to leave because she was raised in a part of the country where black citizens submit to the authority of white law enforcement individuals. The trial court's finding that Daniels could not leave the train station is irrelevant. It is not a question of having the resources to call a cab to leave the station, it is a question of feeling free to walk away from the officers and having the space in which to do so. Here Daniels could have walked away from the officers to another bench or to another part of the station. The trial court incorrectly applied a subjective test rather than the objective test set *823 forth in Mendenhall. We conclude that the trial court erred by ruling that Daniels was illegally seized.

ABANDONMENT
The state contends that voluntary abandonment of property cannot be tainted or made involuntary by a prior illegal stop. It reasons that Daniels lost her reasonable expectation of privacy in the suitcase and its contents when she disclaimed ownership. Daniels responds that because she was illegally stopped, anything found pursuant to that illegal stop is tainted and should have been suppressed.
The state relies on State v. Oliver, 368 So.2d 1331 (Fla. 3d DCA 1979), cert. dismissed, 383 So.2d 1200 (Fla. 1980) as authority for the proposition that an otherwise voluntary abandonment of property cannot be tainted or made involuntary by a prior illegal police stop. Id. at 1335-36. The Oliver court also said, "Only when the police begin to conduct an illegal search can a subsequent abandonment of property be held involuntary as being tainted by the prior illegal search and even that result may vary depending on the facts of the case." Id. at 1336 (citations omitted). As the Oliver court explained it, a court must determine whether that police seizure of evidence invades a reasonable expectation of privacy belonging to the person in question. The court must find that the person, "has made a voluntary decision to avoid a police search by discarding evidence in an area where he has no Fourth Amendment protection. As a consequence, he cannot later claim that, notwithstanding his conduct, he was the victim of a police search as to the evidence he discarded." Id. at 1335.
Once a defendant abandons his suitcases, he lacks standing to challenge either the search of the suitcase or the seizure of its contents. United States v. Roman, 849 F.2d 920, 922 (5th Cir.1988). However, an unconstitutional seizure or arrest which prompts a disclaimer of property vitiates the disclaimer. United States v. Tolbert, 692 F.2d 1041, 1045 (6th Cir.1982), cert. denied, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). The term "abandonment" as applied to illegal seizures does not refer to the traditional meaning of that term in the context of property law. Id. at 1044. Within the meaning of illegal seizures, the concept is a Fourth Amendment issue and the "`capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'" Id. (quoting Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). To determine whether an abandonment is voluntary and not a product of police misconduct, the court must look to see if there is a causal nexus between the unlawful conduct and a defendant's abandonment of his suitcase. Roman, 849 F.2d at 923.
In Tolbert, the defendant was approached by agents as she was about to enter a taxi to leave the airport. She did not have her luggage with her. When asked about her luggage, Tolbert insisted that she was traveling without luggage and specifically disclaimed ownership of the bag in question in that case. Id. at 1044. The Tolbert court reversed the trial court's rejection of the government's argument that Tolbert had abandoned her to the abandonment to determine whether she had been seized at the time she abandoned the luggage. They concluded that she had but that the seizure was legal. In Roman, agents had observed Roman entering the airport carrying a suitcase. He checked two pieces of luggage. The agents became suspicious, felt the bags, and decided to x-ray them. They observed a solid grey mass but no indication of clothing. They approached Roman inside the airplane and identified themselves. Without hesitation, Roman handed the agents his permanent resident alien card. He was asked if he had checked any luggage. He replied that he had not. He stated that he did not have any luggage other than his carry-on bag. He was asked to accompany the agents *824 into the terminal, shown his luggage and asked if it was his. He replied that the suitcases were not his. Roman, 849 F.2d at 921-22. The Roman court found no connection between the officers' illegal conduct in x-raying the defendant's luggage and the defendant's act of free will in abandoning the suitcases. Id. at 923. The government had apparently conceded and the reviewing court assumed for purposes of its opinion that the agents had unlawfully x-rayed the bags. Id. The Roman court noted that at the time Roman initially abandoned the suitcases, the agents were simply asking him questions in a public place, which conduct is perfectly permissible under the Fourth Amendment. Id.
We disagree with the state that even if Daniels was illegally stopped, she lost her reasonable expectation of privacy in her luggage by denying that she owned it. The case law holds that courts must consider the sequence of events leading up to the abandonment in order to determine whether the abandonment was voluntary. If officers have illegally seized a defendant or have begun to conduct an illegal search of property before a defendant has abandoned it, the abandonment may be involuntary, depending on the facts of the case. Tolbert and Oliver. The test is whether there is a causal connection between the illegal conduct and the abandonment.
The trial court sub judice found that there was no abandonment because Daniels did not willingly and voluntarily relinquish a known right to possess. This finding is irrelevant. The test is not whether Daniels willingly and voluntarily relinquished a known right to possess. The test is whether the luggage was abandoned as a direct result of police misconduct, whether that misconduct was illegally seizing Daniels or searching the suitcase before she either gave consent or abandoned it. As we indicated above, the encounter between the officers and Daniels was not an illegal seizure of her person. Palmer, Tolbert, and Roman. Daniels abandoned the suitcase in an area where she had no Fourth Amendment protection, the train station. She made a decision to abandon it, as did her male companion. Thus, Daniels' abandonment of the suitcase was voluntary. The trial court erred by granting the motion to suppress.
Accordingly, we reverse the trial court's suppression order and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
STONE, POLEN and GARRETT, JJ., concur.