585 So.2d 1096 (1991)
STATE of Florida, Appellant,
v.
Marcia KUNTZWILER, Appellee.
No. 90-0349.
District Court of Appeal of Florida, Fourth District.
September 11, 1991.
Robert A. Butterworth, Atty. Gen., Tallahassee, and James J. Carney, Asst. Atty. Gen., West Palm Beach, for appellant.
Donald R. Spadaro of Roderman and Spadaro, P.A., Fort Lauderdale, for appellee.
PER CURIAM.
The State of Florida appeals from the trial court's suppression of evidence obtained as a result of a bus search. We reverse on the authority of Florida v. Bostick, 501 U.S. ___, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
Two detectives from the Broward County Sheriff's Department approached appellee on a bus while stopped in a bus station. The detectives wore windbreakers identifying themselves as law enforcement agents, and identified themselves to appellee, making a point not to block the aisle. One detective explained to appellee that they were part of a drug interdiction program and that cooperation was strictly voluntary. The detective then asked appellee if they could search her bag. She agreed. Appellee pointed to her bag and the detective again informed her that cooperation was voluntary, she again agreed to the search. The other detective opened the bag and discovered a hard square object wrapped in red tape, later determined to be cocaine. Appellee testified that she had not heard the detective say that her cooperation was voluntary and that she believed she had no choice but to allow the search.
*1097 The trial court denied appellee's motion to suppress evidence based upon the alleged involuntary consent. The court specifically stated:
There was no coercion whatsoever here under the circumstances. I find  I reject the defendant's version of what transpired. I find that it is untrustworthy of belief and practically absurd, nonsequitur, and I do reject it.
I do find  I find credibility of the testimony of the officers in this case... . So first of all, on the issue of whether or not there was a consent to search, the Court finds it was free and it was voluntary under the totality of the circumstances, and I so find.
Appellee filed for rehearing based upon the Florida Supreme Court's interim decision in Bostick v. State, 554 So.2d 1153 (Fla. 1989). The trial court reaffirmed its factual findings, stating that he believed the consent to have been voluntary, but acknowledged that he was bound by the supreme court's holding regarding bus searches and granted the motion.
In Florida v. Bostick, the United States Supreme Court rejected the Florida Supreme Court's decision as being a per se rule regarding bus searches and held:
[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.
Bostick, 501 U.S. at ___, 111 S.Ct. at 2389, 115 L.Ed.2d at 401-02.
The record reflects that the trial court applied the correct standard of law to his factual findings originally denying suppression. Accordingly, we reverse the trial court's subsequent suppression order and remand for proceedings consistent with this opinion.
REVERSED AND REMANDED.
DELL and WARNER, JJ., concur.
GLICKSTEIN, C.J., concurs specially with opinion.
GLICKSTEIN, Chief Judge, concurring specially.
A majority of the Supreme Court of Florida in Bostick v. State, 554 So.2d 1153 (Fla. 1989), adopted a "Per Se" rule in these bus search cases which a very small number of this court had advocated in State v. Avery, 531 So.2d 182 (Fla. 4th DCA 1988), quashed, 555 So.2d 351 (Fla. 1990). Accordingly, albeit far from unanimous, the judicial arm of Florida had spoken and wisely in my view.
We Floridians, however, because of a constitutional amendment in 1982, abandoned any claim we might have for selfdetermination in Fourth Amendment cases by voting to add limiting language to our then inviolate section 12 of our Declaration of Rights, which now reads:
Section 12. Searches and seizures.  The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

(Emphasis added.)
Many, perhaps a majority, of Floridians are as pleased with such limitation almost ten years later as they were in 1982. Yet, *1098 in my view  whether the pendulum was moving left or right  the decision was immensely unwise; and the subsequent majority decision of the United States Supreme Court in Florida v. Bostick, 501 U.S. ___, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), gutting the "Per Se" rule, proves my point  at least to me.
The Honorable Sol Wachtler, Chief Judge of the State of New York, in his 1987 remarks to the Chautauqua Conference on the American Constitution, observed:
Most of the framers left the Philadelphia Convention with a growing commitment to this "compound republic"  a system of dual federalism which, while establishing a federal Constitution, left intact that great body of state powers concerning the state's ability to regulate public health, safety, education, community affairs and family relations.
State constitutions, therefore, comprise a significant portion of the American constitutional system. They authorize state power and, with the United States Constitution, also limit it. The United States Constitution of 1787 thus did not create the American constitutional system; rather, it completed that system.
Consider the Supremacy Clause of the United States Constitution, which provides that it and laws and treaties pursuant to it "shall be the supreme law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (Article VI, section 2). That is why state court judges must swear to uphold both the Constitution of the United States and the Constitution of their state. If the framers had intended the United States Constitution to replace state constitutions, they would undoubtedly have made their Constitution the "only," rather than the "supreme," law of the land.
Indeed, the United States Constitution was, in large part, modeled after state constitutions. I proudly digress to note that it was our New York State Constitution of 1777 which first called for the three separate branches of government and spawned the constitutional guarantees of our liberties  guarantees later framed in the United States Constitution's Bill of Rights  which were first made public here in New York. And the United States Constitution was never intended to displace those state constitutions. Alexander Hamilton, another author of The Federalist Papers, contemplated in No. 17 that the state would remain the principal protector of individual rights  the "immediate and visible guardian of life and property."
Although some national law schools appear reluctant to teach constitutional decisions of state courts of last resort, omitting them from their Constitutional Law courses, casebooks and texts, the fact remains that state courts, relying on state constitutions, have admirably fulfilled Hamilton's prediction since before the establishment of the United States Supreme Court. Justice William Brennan applauds this trend, calling its recent resurgence "the most fascinating and important development in constitutional jurisprudence today." Between 1970 and 1984 state courts have handed down over 350 published opinions holding that the minimal requirements under the United States Constitution established by the Supreme Court were insufficient to satisfy their own constitutional requirements.
Justice O'Connor's majority opinion reflects intuitive perceptions of the right thing to do which are painfully foreign to me and, hopefully, a substantial number of Floridians who, unlike the Justice, perceive a real difference between police intrusion on a bus, train, or airplane and one in a venue where an individual's freedom of chosen movement is so less restricted.
Justice Marshall's dissent for the minority was a comfortable intuitive perception for me when he said:
At issue in this case is a "new and increasingly common tactic in the war on drugs": the suspicionless police sweep of buses in interstate or intrastate travel. United States v. Lewis, 287 U.S.App. D.C. 306, 307, 921 F.2d 1294, 1295 (1990); see United States v. Flowers, 912 F.2d 707, 710 (CA4 1990) (describing technique *1099 in Charlotte, North Carolina); United States v. Madison, 936 F.2d 90, 91 (CA2 1991) (describing technique in Port Authority terminal in New York City); United States v. Chandler, 744 F. Supp. 333, 335 (DC 1990) ("[I]t has become routine to subject interstate travelers to warrantless searches and intimidating interviews while sitting aboard a bus stopped for a short layover in the Capital"); 554 So.2d 1153, 1156-1157 (Fla. 1989) (describing Florida police policy of "`working the buses'"); see also ante, at 2384. Typically under this technique, a group of state or federal officers will board a bus while it is stopped at an intermediate point on its route. Often displaying badges, weapons or other indicia of authority, the officers identify themselves and announce their purpose to intercept drug traffickers. They proceed to approach individual passengers, requesting them to show identification, produce their tickets, and explain the purpose of their travels. Never do the officers advise the passengers that they are free not to speak with the officers. An "interview" of this type ordinarily culminates in a request for consent to search the passenger's luggage. See generally United States v. Lewis, supra, 287 U.S.App.D.C., at 308, 921 F.2d, at 1296; United States v. Flowers, supra, at 708-709; United States v. Madison, supra, at 91; 554 So.2d, at 1154.
These sweeps are conducted in "dragnet" style. The police admittedly act without an "articulable suspicion" in deciding which buses to board and which passengers to approach for interviewing. By proceeding systematically in this fashion, the police are able to engage in a tremendously high volume of searches. See, e.g., Florida v. Kerwick, 512 So.2d 347, 348-349 (Fla.App. 1987) (single officer employing sweep technique able to search over 3,000 bags in nine-month period). The percentage of successful drug interdictions is low. See United States v. Flowers, supra, at 710 (sweep of 100 buses resulted in seven arrests).
To put it mildly, these sweeps "are inconvenient, intrusive, and intimidating." United States v. Chandler, 744 F. Supp., at 335... .
... The District Court for the District of Columbia spoke in equally pointed words:
"It seems rather incongruous at this point in the world's history that we find totalitarian states becoming more like our free society while we in this nation are taking on their former trappings of suppressed liberties and freedoms."
Id. at ___, 111 S.Ct. at 2389-91, 115 L.Ed.2d at 402-04 (footnote omitted).
I recently saw a full front head shot of a gorilla on a card, the caption under which photograph was: "When I want your opinion, I'll give it to you." We Floridians put ourselves on the receiving end of that message by the 1982 Constitutional Amendment. It was a terrible mistake; but our ignorance is remediable. We Floridians need not be yoked unless we continue to choose to be while the rest of the world throws off theirs. Hopefully, we are the only state to have stumbled so badly.